# JULIUS PIETZUK v. KANSAS CITY RAILWAYS COMPANY, Appellant.

### Division One, July 11, 1921.

1. **RECORD ON APPEAL: Affidavit: Error of Stenographer.** On an appeal the bill of exceptions imports verity; and an affidavit made by the attorney for appellant, to the effect that the word "satisfactory" was used by him in a question he propounded to a juror on his *voir dire* examination, and not the word "unsatisfactory" as the bill of exceptions shows, availeth nothing, the trial court having made no order directing an amendment of the record.

2. **JUROR: Prejudice: No Challenge or Objection.** Where the juror on his *voir dire* examination was not challenged, and no objection was made to his competency or qualifications, an objection first appearing in the motion for a new trial that he was prejudiced against appellant cannot be considered on appeal. And in this case had the juror been timely challenged on the facts disclosed by the affidavits filed in support of the motion for a new trial, such challenge should have been overruled.

3. **NEGLIGENCE: Instruction: Inclusion of Specific Allegation.** Where the petition alleges that the conductor of a street car, which had stopped at an elevated station to take on passengers, caused said car to start forward, "and before plaintiff was able to get into the vestibule of said car or on the platform of said car, and while yet standing on the steps of said car with one foot, the conductor closed the door of said car while same was moving, pushed plaintiff off the step and, as a result thereof, plaintiff was thrown vio-

lently from said car to the street below," an instruction requiring the jury to find that the "conductor negligently caused said car to start forward and negligently closed the door of said car while said car was moving, and as a direct result thereof the plaintiff was thrown from said car to the street below and injured" omits no specific allegation. In requiring the jury to find that plaintiff was "thrown from" the car it used words of like significance as the allegation "pushed plaintiff off said car."

4. ———: Physical Impossibility: Peremptory Instruction. The evidence in this case does not show that it was a physical impossibility for the plaintiff to have been injured in the manner claimed by him and his witnesses, and therefore the trial court did not err in refusing to give to the jury a peremptory instruction to find for defendant.

5. ARGUMENT TO JURY: Character of Defendant: Withdrawal. In his closing argument to the jury plaintiff's counsel said that no jury would live long enough to sit on a case against the defendant company in which that company would not come in without a defense of some kind. Defendant's counsel objected that the remark was outside of the record, wholly incompetent and prejudicial, and asked that plaintiff's counsel be reprimanded. The court directed counsel to proceed, to which action defendant's counsel excepted. Thereupon plaintiff's counsel withdrew the remark, and substituted another to the effect that the defendant company could not be expected to come into court and admit liability, to which no objection was made. Held, that the trial court was in a better position to determine the propriety and effect of the first statement made by plaintiff's counsel than is the appellate court; that the fragmentary part of the counsel's speech was not sufficient to have influenced the jury in arriving at their verdict; and that if there was any transgression of proper argument it was cured by its withdrawal.

6. VERDICT: Contrary to Greater Weight. Where the record is devoid of anything which could give rise to a logical conclusion that the jury were prejudiced, or corrupt, or grossly negligent, or that they disregarded the instructions of the court, their verdict cannot on appeal be set aside as contrary to the greater weight of the evidence, although only three witnesses testified to the same facts showing defendant was guilty of the negligence charged, and six for defendant testified to the contrary, only one of whom identified plaintiff as the man who was injured.

7. EXCESSIVE VERDICT: $15,000. Plaintiff, in attempting to board a street car from an elevated platform, was thrown to the street,

thirty feet below. He sustained a broken jaw, a broken chest, his legs were hurt, and five or six teeth were knocked out; there was a fracture at the base of the skull, which produces a dizziness in the head, and makes it dangerous for him to work about machinery or upon a scaffold; the bones of the jaw are not in perfect apposition, the teeth being out of line; there is an irritability in the spinal cord, and his symptoms are nervous dizziness and occasional headaches; his physician's bill was $185, and he was earning $572 a year prior to the accident, was then thirty-three years of age, and two years and a half afterwards went to work again, and his chances of complete recovery and of permanent impairment are about equal. *Held*, that a verdict for $15,000 is excessive by $4,000.

Appeal from Jackson Circuit Court.—*Hon. Clarence A. Burney,* Judge.

REVERSED AND REMANDED.

*Chas. N. Sadler* and *Mont T. Prewitt* for appellant.

(1) The court erred in failing 'and refusing to grant defendant a new trial for the reason that venireman C. (Charles) G. Green did not fully, accurately, and truthfully answer all questions propounded to him on the *voir dire* examination, particularly concerning any present or previous feeling of bias or prejudice against defendant growing out of litigation against defendant, resulting in prejudice in that defendant was caused to exercise one of its peremptory challenges in removing said venireman, when a truthful disclosure would have furnished cause for trial court to have excused him. Vessels v. Light Co., 219 S. W. 80; Theobald v. Transit Co., 191 Mo. 395; Carroll v. United Rys., 157 Mo. App. 247, 264; Gibney v. Transit Co., 204 Mo. 704; State v. Wyatt, 50 Mo. 309; Hughes v. Ry., 60 S. W. (Texas) 562. (2) The court erred in giving instruction numbered 1 requested by plaintiff. State ex rel. Coal Co. v. Ellison, 270 Mo. 645, 653; Degonia v. Ry.,

224 Mo. 565, 589; Northam v. Rys., 176 S. W. 227; Mc-Grath v. Ry., 197 Mo. 105; Davidson v. Transit Co., 211 Mo. 320, 361; State ex rel. Newspaper Assn. v. Ellison, 176 S. W. 11; Roscoe v. Ry., 202 Mo. 576, 588; Bank v. Murdock, 62 Mo. 70; Hamilton v. Crowe, 175 Mo. 634. (3) The court erred in refusing to give to the jury the peremptory instruction directing a verdict in favor of defendant, requested at the close of all the evidence, under the physical-facts doctrine. State v. Bryant, 102 Mo. 24, 32; State v. Turlington, 102 Mo. 642, 663; Daniels v. Ry., 177 Mo. App. 280; Scroggins v. Met., 138 Mo. App. 215, 219. (4) The court erred in refusing to sustain the motion for new trial because of the misconduct upon the part of plaintiff's counsel in making incompetent, prejudicial and improper argument. Beck v. Rys., 129 Mo. App. 7, 23; Rice v. Sally, 176 Mo. 107, 146; Robertson v. Wabash, 152 Mo. 382; Brown v. Ry., 66 Mo. 588; Neff v. City of Cameron, 213 Mo. 350, 369; Williams v. Ry., 123 Mo. 573; Collier v. City of Shelbyville, 219 S. W. 713. (5) The court erred in refusing to sustain the motion for new trial on the grounds that the verdict and judgment are contrary to the greater weight of the evidence and because the jury in arriving at their verdict wholly disregarded the instructions given by the court. Price v. Evans, 49 Mo. 396; Lehnick v. Met., 118 Mo. App. 611; Chitty v. Ry., 148 Mo. 64, 78; Spiro v. Transit Co., 102 Mo. App. 250, 264; Spohn v. Mo. Pac. Ry. Co., 87 Mo. 74; State v. Fannon, 158 Mo. 149; Payne v. Railroad, 136 Mo. 362; Hook v. Railroad, 162 Mo. 569; Fugler v. Bothe, 117 Mo. 475, 501. (6) The verdict is excessive. Rigg v. C. B. & Q., 212 S. W. 878; Hulse v. St. Joseph Ry. Co., 214 S. W. 155; Dominick v. Mining Co., 255 Mo. 463; Campbell v. United Rys., 243 Mo. 141, 159; Stolze v. Transit Co., 188 Mo. 581; Norris v. Ry., 239 Mo. 695, 704; Lyons v. St. Ry., 253 Mo. 143, 163; Bragg v. Street Ry. Co., 192 Mo. 351; Willits v. C. B. & Q., 221 S. W. 65.

*W. W. McCaules* and *Hogsett & Boyle* for respondent.

(1) The court did not err in refusing a new trial because of the answers of venireman Chas. G. Green on *voir dire* examination. (a) The venireman was not challenged by the defendant and there is no objection or exception in the record to any ruling of the trial court relating to the matter. Therefore defendant is in no position to complain. City of Tarkio v. Cook, 120 Mo. 1, 11. (b) The affidavits of its claim agents filed by defendant do not show any prejudice on Green's part. McManama v. United Rys. Co., 175 Mo. App. 43; Kennelly v. K. C. Rys. Co., 214 S. W. 237; Albert v. Ry. Co., 192 Mo. App. 665; Tawney v. Rys. Co., 262 Mo. 602; Shore v. Dunham, 178 S. W. 900; State v. Green, 229 Mo. 642; Hudson v. Ry. Co., 53 Mo. 525; State v. Ivy, 192 S. W. 737; In re Bowman, 7 Mo. App. 568. (c) The question as to the competency of jurors is one addressing itself to the sound discretion of the trial court and that discretion will not be interfered with unless palpably abused. State v. Rasco, 239 Mo. 535; Kennelly v. Rys. Co., 214 S. W. 237; McManama v. Railroad, 175 Mo. App. 50, 51. (2) The court did not err in giving Instruction Number 1 requested by plaintiff. The instruction is not broader than the petition but is strictly and literally limited to the percise negligence alleged therein. Riley v. City of Independence, 258 Mo. 682; Johnson v. Met. St. Ry. Co., 177 Mo. App. 300; Schwanenfeldt v. St. Ry. Co., 187 Mo. App. 592; Ottofy v. Trust Co., 196 S. W. 430; Green v. Standard Oil Co., 199 S. W. 749; Quinley v. Traction Co., 180 Mo. App. 300, 302; Little v. Railroad, 139 Mo. App. 55. (3) The court did not err in refusing the peremptory instruction requested by defendant. (a) The rear end of the car stopped only twenty-five feet from the west edge of the platform, so that plaintiff's estimate of the distance he was carried before he fell was absolutely

accurate and in accordance with the physical facts. Costello v. Kansas City, 219 S. W. 391. (b) A court should not take a case from the jury on the "physical facts" theory merely because the varying estimates of witnesses as to distance, made in a moment of extreme excitement, are not mathematically exact. Swigart v. Lusk, 192 S. W. 141; Hays v. Ry., 182 Mo. App. l. c. 402, 403; Clark v. Long, 196 S. W. 412. (c) The estimates as to the length of the station platform and the length of the car were given by defendant's witnesses, and the court could not say as a matter of law that these estimates were correct, their credibility being for the jury. Ganey v. Kansas City, 259 Mo. 660; Gardner v. Railroad, 223 Mo. 389. (d) It will hardly do to say that the evidence conclusively shows that plaintiff boarded a moving car, when three witnesses positively testified that it was standing still. (4) There was no improper or prejudicial argument on the part of plaintiff's counsel. (a) The statement objected to was nothing more than a tribute to the resourcefulness and ability of defendant's able counsel who tried the case. The statement was made goodnaturedly and in no spirit of criticism of the defendant, and was evidently so understood by the trial court who heard all the argument. Bishop v. Inv. Co., 229 Mo. 733. (b) The trial court was in much better position to judge the meaning and effect of the statement complained of than this court, for the trial judge heard all of the argument, while only an isolated sentence thereof is presented to this court. The trial court evidently considered defendant's objection to the statement as utterly trivial, as indeed it was. (c) But even giving to the argument the strained construction which defendant strives to place upon it, the argument was not an improper one and did not transcend the limits of legitimate debate. Paul v. Dunham 214 S. W. 265; City of Kennett v. Const. Co., 273 Mo. 280; Huckshold v. Ry. Co., 90 Mo. 558; Ostertag v. Railroad, 261 Mo. 475, 479; Bradley v. City, 90 Mo. App. 424;

Turnbow v. Kansas City Rys. Co., 211 S. W. 46; Pope
v. Ry., 175 S. W. 955; Gidionsen v. Ry. Co., 129 Mo. 403;
Bank v. Camery, 176 S. W. 1077; Whelan v. Chemical
Co., 188 Mo. App. 605; Cook v. Neely, 143 Mo. App. 639;
Franklin v. Railroad, 188 Mo. 545; Lilly v. K. C. Rys.
Co., 209 S. W. 972; Ins. Co. v. Railroad, 174 Mo. App.
549. (d) The defendant did not specifically except to
the failure of the court to reprimand plaintiff's counsel,
nor did it move to dismiss the jury or to declare a mis-
trial. So in no event is there anything preserved for
appellate review. McKinney v. Laundry Co., 200 S. W.
118; Harriman v. Dunham, 196 S. W. 443; Torreyson v.
Ry., 246 Mo. 706; Ostertag v. Railroad, 261 Mo. 479;
State v. Chenault, 212 Mo. 137; Peck v. Traction Co.,
131 Mo. App. 143; Estes v. Railroad, 111 Mo. App. 5;
Payne v. Ry., 129 Mo. 405; State v. Taylor, 134 Mo. 158.
(e) When defendant objected to the argument, plain-
tiff's counsel immediately withdrew the remark objected
to, and without objection substituted in place of it an-
other argument to which the defendant made no ob-
jection. This leaves no room for complaint on defend-
ant's part. Green v. Standard Oil Co., 199 S. W. 750;
Hollenbeck v. Ry. Co., 141 Mo. 98; Grace v. Ry. Co., 212
S. W. 42; Almond v. Modern Woodmen, 133 Mo. App.
390; Cross v. Sedalia, 203 S. W. 648; Sinclair v. Tel.
Co., 195 S. W. 558; Wellman v. St. Ry. Co., 219 Mo. 126;
Collier v. Moving Co., 147 Mo. App. 700. (5) The ver-
dict and judgment are not contrary to the greater weight
of the evidence. (a) This court will not weigh the
evidence in a law case. Linderman v. Carmin, 255 Mo.
62; Hutchinson v. Safety Gate Co., 247 Mo. 71; Howell
v. Sherwood, 242 Mo. 513; Norris v. Ry. Co., 239 Mo.
695; Moore v. King, 178 S. W. 124. (b) The jury and
the trial court have found that plaintiff's case is sus-
tained by the greater weight of the evidence. This con-
cludes the defendant. Authorities supra. (6) The ver-
dict is not excessive. (a) In passing on the size of the
verdict this court will consider the decreased purchasing

power of money.  Hurst v. Railroad Co., 219 S. W. 568;
Hulse v. Ry. Co., 214 S. W. 156; Duffy v. Ry. Co., 217
S. W. 883; Hays v. Ry. Co., 183 Mo. App. 608.  (b)  In
the light of the late cases a verdict of $15,000 is not ex-
cessive for the injuries which the plaintiff was shown
by the undisputed evidence to have sustained.  Smith
v. Ry. Co., 213 S. W. 485, 486; Holzemer v. St. Ry. Co.,
261 Mo. 379; Hubbard v. Railroad Co., 193 S. W. 579;
Shaw v. Kansas City, 196 S. W. 1094; Miller v. Harp-
ster, 273 Mo. 605; Myers v. City of Independence, 189
S. W. 817.

ELDER, J.—This is an action for damages for per-
sonal injuries alleged to have been sustained by plain-
tiff in being thrown from a street car which he was un-
dertaking to board, operated by defendant on an elevated
structure at Armour Station, on the state line between
Kansas City, Missouri, and Kansas City, Kansas.

On March 18, 1916, the defendant was operating a
line of elevated street railway connecting Kansas City,
Missouri, and Kansas City, Kansas, running across the
state line between Missouri and Kansas.  At the inter-
section of the state line and what was known as Central
Avenue, it maintained an elevated station called Armour
Station.  The tracks at that point were about thirty
feet above the street level.  The station platform was
about fifty to fifty-five feet in length, from east to west,
and at the west end thereof was a railing or fence which
extended out to within three feet and four inches of the
north rail of the west-bound track.  On the north side
of the platform, midway thereof, and about four or five
feet north of the tracks, was a shelter house.  About the
center of the shelter house was a door leading out upon
the station platform.  Passengers intending to take a
west-bound car ascended from the street by a stairway
to the shelter house, passed through the shelter house and
out upon the platform where cars customarily stopped
to receive and discharge passengers.

Plaintiff, who is a Russian, was examined through an interpreter. He testified that he was thirty-three years of age, had come to America in August, 1913, lived in Kansas City, Kansas, was employed at the time of the accident at Armours, and had previously been working steadily for that concern in the wool house, where wool was washed and dried, earning about $10 or $11 a week; that from about 4 p. m. to 6:40 or 7 p. m. on the aforesaid 18th day of March, he had visited his sister at St. Mary's Hospital in Kansas City, Missouri, and had then taken a street car and on his way home had stopped off at a saloon near the state line to cash his pay check, it being Saturday and pay day; that while in the saloon a friend, Dominick Grib, had bought him two glasses of beer, and plaintiff had purchased a half pint of whiskey, which he took with him; that at "fifteen or twenty minutes to nine" he and Grib (who at the time of the trial plaintiff testified was in France) left the saloon and ascended to the elevated platform at Armour Station, plaintiff intending to take passage upon a westbound Central Avenue car; that when he went ont upon the platform no car was there, but many people were waiting; that after he had waited "maybe two or three minutes," the Central Avenue car came and stopped to take on passengers, it being then full of people; that several of the persons waiting proceeded to get upon the car at the rear entrance, but that many more were left and "didn't get in;" that plaintiff was in the rear of those who got on, and had progressed as far as to have his right foot on the vestibule platform of the car, his left foot on the step, and had taken hold of the handle bars with both hands; that when he got on the car it was standing still, with the vestibule door open; that while in the position above mentioned the conductor rang the bell and the car started; that the car moved forward about twenty-four to thirty feet when the conductor shut the folding vestibule door, which struck plaintiff in the chest and pushed him off the car; that the rear end

of the car was then about six feet beyond the platform, and he fell to the street pavement about twenty-five feet below, striking on his head and feet or legs; that he became unconscious, and when he came to he was in St. Mary's Hospital.

On cross-examination plaintiff testified that while in the saloon before the accident, he had nothing to drink but two glasses of beer; that he did not attempt to board the car while it was in motion, or run after it and get on while it was moving; that he knew he must not board a car while it was moving.

On re-direct examination he stated that he had purchased the half pint of whiskey for one Alexander Cardash at the latter's request, and had not opened the bottle.

Adam French testified on behalf of plaintiff, through an interpreter, that he had known plaintiff a little in Russia; that he was standing on the platform at the station when plaintiff attempted to board the car in question, and that the car was then standing still; that the car was full, with many people in the rear vestibule, and that there were about twenty people waiting to take the car; that when plaintiff got on, the conductor rang the bell and the car started, with plaintiff standing on the steps; that when the rear end of the car was about twenty-four or twenty-five feet "off the platform" plaintiff fell to the street below, his body striking "towards Kansas" (or west) "from the foot of the steps." On cross-examination the witness stated that he had been in the saloon with plaintiff and Grib, and that Grib had bought them all two glasses of beer; that he had been standing on the platform, among the people who were waiting, about two or three minutes before the car came up; and that he wanted to take the same car as plaintiff, but that there was no way of getting on, as it was too full.

Alexander Krivinia, a witness for plaintiff, testified that he was on the station platform the night in question waiting for a Central Avenue car; that he had been wait-

ing "about two or three minutes," when the car came and stopped; that it was full of people, with a number waiting to get on; that some got on, but that he could not get on, although he tried; that he saw plaintiff, whom he had often seen before, attempting to board the car at the rear; that plaintiff "was on the step with one foot, with another foot on the platform inside of the car;" that when plaintiff got on the step the conductor rang the bell and the car started, with the door open; that plaintiff tried to get in the car, but was unable to do so, as it was full; that the conductor shut the door, pushing plaintiff off the car, and he fell, being then "about thirty feet" beyond the platform. On cross-examination the witness stated that the accident happened "pretty near nine o'clock."

George Chess, ambulance driver for the Police Department of Kansas City, Kansas, a witness for plaintiff, testified that when he arrived at the scene of the accident plaintiff's body was lying on the street about thirty feet west of the station, or ten feet west of the foot of the stairway, between the curb and the surface car-tracks. On cross-examination witness stated that Armour Station was elevated about twenty-five or thirty feet above the street surface; that the station platform was about fifty feet long; that when plaintiff was picked up he was unconscious, and witness did not examine his breath to see if he was intoxicated; and that neither the bottle of whiskey which was in plaintiff's coat pocket, or the seal thereon, was broken.

William Lawson, police officer, a witness called by plaintiff, testified that he was standing across the street from where plaintiff fell; that he "heard a noise and looked over, and saw this man lying in the street and went over there."

The evidence for defendant may be summarized as follows:

The deposition of L. C. Biederman, engaged in the bakery business at Keytesville, Missouri, was read in

evidence. The witness testified that on March 18, 1916, he resided in Kansas City, Kansas, and that about 9:30 p. m. of that day he was going home in the back vestibule of a west-bound "pay-as-you-enter" street car; that as he got on the car at Armour Station, after a number of other people, the conductor closed the door; that "after the car had started, some one run out of the station and tried to get on the car. It was right close to the edge of the platform;" that the car was then in motion and when "this man" grabbed the rear end of the car he was within about six or seven feet of the west end of the platform, with the car going "probably three or four miles an hour." On cross-examination witness said that when he saw "this man" first approach the car it was about forty feet from the east end of the platform; that he supposed the platform was "probably sixty feet" in length; that he first saw the man as he ran out of the station.

George Heinzman testified that he helped his father run a lunch wagon across the street from Armour Station; that on the night in question, at 9:35 p. m., he was standing at the east end of the station platform; that "I was going up there to go home and there was a Central Avenue car come up and it stopped and loaded on about—oh, I should say—ten or fifteen passengers, and just about the time it started I heard somebody holler and I seen a man running, and at that time the car had run about thirty feet and it seemed like he either tried to get hold the middle hand-hold or the last one, and just about that time he went down. It just seemed like it happened in about a second." On cross-examination the witness stated that after the man succeeded in getting hold of the handrail he rode on the step of the car, "on the platform," for about ten feet; that immediately upon passing the railing at the end of the platform he fell; that witness then went down to the street, and he lay about ten feet west of the west end of the platform.

C. M. Snow testified that he was employed by Swift's Packing Company and prior to 1917 had been employed by defendant as a motorman, being so employed on March 18, 1916; that on the night of that day, about 9:30 p. m., he was standing on the platform at Armour Station, just to the west of the station door, waiting for a car on which to go home, when a Central-Fairmount car came along. Describing the accident he said: ''Well, as that wasn't the car I wanted to take, I wanted either Chelsea or Quindaro car, I didn't pay any* attention, and I didn't attempt to get on it, and there was several people got on the car . . . After they was all on that wanted that car, the conductor closed his door on the car and started the car, and after—when the car got to the even, or a little past of even, which would be a little west of that station door, there was some man come running out right fast and he came running out, he was going west, south, and he turned like this (indicating) and boarded the car on th outside, and he was on the car just a second, and when he went off he went off of the edge of the platform, down to the pavement below.'' On cross-examination witness stated that the man who ran after the car was running twelve miles an hour, or ''a third faster than the car;'' that there were three west-bound lines of cars operating over the elevated tracks in question, all going to different places; that a man in the shelter house would not know what car had stopped there until he got outside, so as to see it; and that he would not know the man who ran after this particular car if he saw him.

W. T. Wilhite testified that he was in the rear vestibule of the car, about 9:35 p.m.; that ''we stopped there at the Armour Station and took on a few passengers, about eight or ten, and got them in there and the conductor closed the door and gave the signal to go on, and as the car started up I saw some man start towards the door as the car got a little past the door of the station, and he grabbed for the railing and rode I should judge eight or ten feet and it looked like he jumped right off

again before the conductor could get out of the door to get him. He had given the signal to stop, and it looked like this man missed his footing or something and went down over the viaduct. That was at the west end." Witness further said that the car had run about twenty-five or thirty feet from the east end of the viaduct when the man undertook to grab hold of it, and that the car was running five or six miles an hour.

The deposition of Richard A. Coon was read in evidence. His testimony, which was taken on August 27, 1918, was to the effect that he was then a riveter for the Standard Ship Building Corporation at Shooters Island, New York, and expected to enter the military service within a few days; that on March 18, 1916, he was conductor of the car on which the accident occured; that "we stopped at Armour Station, state line on the elevated structure, and loaded possibly twenty to twenty-five passengers; the car having all on board that seemed to want to get on, I closed the door, gave the motorman the signal to go ahead. After the car had run about thirty to thirty-five feet, two or three men came out of the station door on the elevated, the first one tried to catch the car, and in jumping, as near as I could make out, caught the upright rail with his hand and possibly had one foot on the step. I gave the motorman the emergency signal to stop and opened the door at the same time to try to grab the man, and before I could do so, the railing on the west end of the elevated platform brushed him off, and he fell in the street below. As soon as the car was stopped the motorman called an ambulance and practically done all we could to aid the man. We afterward got the names and addresses of all of the witnesses we could, made a report of the matter to barn headquarters, and boarded our car and went on to the end of the line.

"Q. What was the name of this man who was hurt? A. The name I got was Julius Pietzuk.

"Q. Was this car standing still or in motion at the time this man attempted to board it? A. It was in motion.

"Q. Is it a fact that this man attempted to board this car when it was standing still on this elevated structure at Armour Station? A. No, sir, the man was not even in sight when the car was standing still." Witness further testified that the car was about forty feet long.

J. E. Shindler, auto mechanic, testified that he was sitting on the rear longitudinal seat of the car, facing south; that "the conductor closed the car and the motorman started the car, and there was a man on the platform there run out to get on; grabbed on the steps, and I presume that the railing that came out there knocked him off—was the only thing I could see that did it."

Frank M. Wisdom, connected with the claim department of defendant, testified that Dr. H. L. Regier, who had first attended plaintiff after the accident, and who testified for plaintiff, had told witness that "the man had the evidence of having been drinking; he could tell that very easily."

None of the witnesses for defendant, except the conductor of the car, identified plaintiff as the man they saw running after the car. Witnesses Snow and Shindler, who were asked if they could identify him, said they could not.

The foregoing outlines in general the case made. Further matters pertinent to the questions presented for review will be referred to in the course of the opinion.

The negligence charged in the petition is pleaded as follows: "The conductor without waiting for plaintiff to get safely within said car signaled the motorman in charge of said car to start said car forward; that the motorman did, in obedience to said signal, start said car forward, and before the plaintiff was able to get into the vestibule of said car or on the platform of said car, and while yet standing on the step of said car with one foot the conductor closed the door of said car while same was moving, pushed plaintiff off the step and, as a result thereof, the plaintiff was thrown violently from said car to the street below, a distance of about thirty or thirty-five feet."

The answer was a general denial, coupled wih a plea of negligence of the plaintiff in attempting to board a moving car.

The jury returned a verdict for plaintiff assessing his damages at $15,000, and the court rendered judgment accordingly. After an unsuccessful motion for a new trial and motion in arrest of judgment, defendant appeals.

The case has been well briefed in this court by counsel for both appellant and respondent.

I. Defendant assigns as error that "the court erred in failing and refusing to grant defendant a new trial for the reason that venireman C. (Charles) G. Green did not fully, accurately, and truthfully answer all questions propounded to him on the *voir dire* examination, par-

Juror:
Prejudice.

ticularly concerning any present or previous feeling of bias or prejudice against defendant growing out of litigation against defendant, resulting in prejudice in that defendant was caused to exercise one of its peremptory challenges in removing said venireman, when a truthful disclosure would have furnished cause for the trial court to have excused him."

With respect to the *voir dire* examination of the juror Green, the record shows the following:

EXAMINATION BY MR. HOGSETT:

"Q. Have any of you gentlemen ever been sued for personal injuries? A suit brought against you by any one claiming to have been hurt as a result of any fault on your part? On the other hand, have any of you ever brought a suit for personal injuries which might create a prejudice in favor of such an action in your mind? Juror: I had a suit.

"Q. Your name, please? A. C. G. Green.

"Q. And against whom was your suit? A. Street Railway Company.

"Q. And in a general way what was the nature of it, Mr. Green? A. It was a personal injury.

"Q. Were you a passenger on the car? A. Yes, sir.

"Q. (Continuing)—at the time? Was your case disposed of by trial or by settlement? A. By trial.

"Q. And was the outcome of it such that you would have any feeling at all growing out of the occurrence, either for or against the company? A. No, sir.

"Q. Could you sit on a case in which that company is involved and be a fair juror in the case? A. Yes, sir. . . .

EXAMINATION BY MR. PREWITT:

"Q. Now, Mr. Green, I believe you said you had a suit against the company? Did have a suit? A. I had one.

"Q. How long ago, Mr. Green? A. Well, it was tried a year ago this fall some time, about a year and a half.

"Q. Who represented you, Mr. Green? A. I can't recall his name now. He is up in the Scarritt Building.

"Q. Who tried it for the street railway company? A. Conkling.

"Q. Who? A. Conkling.

"Q. Roscoe Conkling, the young man? A. Yes, sir.

"Q. Was that suit for personal injuries? A. Yes, sir.

Q. Do you have some feeling of prejudice against the company on account of the accident? A. No, sir.

"Q. (Continuing)—did you? Growing out of the suit? A. No.

"Q. Have you ever had any feeling of prejudice against the street car company? No, sir.

"Q. Do you think you could sit in this case, Mr. Green, without any feelings of bias or prejudice against the company growing out of this suit? A. Yes, sir.

"Q. Was the disposition of the suit unsatisfactory (satisfactory) to you? A. Yes, sir."

Learned counsel for defendant contend that the foregoing examination was not reported by the official court reporter, but by a substitute who inaccurately reported this question occurring therein, to-wit: "Was the

disposition of the suit *unsatisfactory* to you?'' Counsel maintain that the question as asked was: ''Was the disposition of the suit *satisfactory* to you?''

To this Mr. Prewitt, of counsel makes affidavit, stating that the error first came to his knowledge on June 16, 1919, the trial having been held on May 1 and 2, 1919. The trial court having made no order directing an amendment of the record, this affidavit is unavailing, for it is the settled law that on appeal to this court the bill of exceptions imports verity. [White v. Mo. Pac. Ry. Co., 178 S. W. l. c. 84; Althoff v. Transit Co., 204 Mo. 166; State v. Johnson, 255 Mo. 281; Stegman v. Berryhill, 72 Mo. 307.]

Counsel further insist that venireman Green had ''a feeling amounting to a prejudice against this defendant at the very time he was sitting on the panel in this case.'' In support of this insistence counsel refer to affidavits made by Messrs. Roscoe P. Conkling and Dean Davis, attorneys for defendant, filed in connection with defendant's motion for a new trial. The affidavit of Mr. Conkling, made May 9, 1919, is to the effect that about October, 1917, he represented the defendant company herein or its predecessors, in the trial of a suit brought against the Receivers of the Metropolitan Street Railway Company by Charles G. Green; that the jury in said cause returned a verdict in favor of said Green for $1000; that affiant made several efforts to settle said judgment with Mr. Robert F. McKinstry, attorney for Green, and, after some negotiation, Mr. McKinstry stated to affiant in September, 1918, that said judgment could be settled for $1000, which was its face value, minus interest; that some time in December, 1918, or January, 1919, affiant caused a check for $1000 to be paid to said McKinstry in settlement of said judgment; that shortly thereafter said McKinstry notified affiant that Green was insisting that interest be paid on said judgment; that a number of times during January, February and March, 1919, said McKinstry stated to affiant that said Charles G. Green

was very angry about the failure of defendant to pay the interest on said judgment. The affidavit of Mr. Davis, made May 7, 1919, is to the effect that on May 6, 1919, he interviewed Charles G. Green concerning a lawsuit which said Green had against defendant herein, or its predecessors, growing out of an accident on June 26, 1915, when said Green was injured boarding a car of defendant, or its predecessors; that in said conversation said Green stated that about September, 1918, he agreed to settle the judgment obtained by him in said suit for $1000, provided said amount was paid him within a few days thereafter, but that he did not hear anything more of the settlement until about the latter part of December, 1918, when he received a check for $500 as his part of the settlement; that said Green stated that he took the check for $500 but protested the failure to have received interest on the $1000, which to May 1, 1919, amounted to $92.50, and that he was expecting that amount to be paid him by defendant, the Kansas City Railways Company; that said Charles G. Green was one of the jurymen on the panel in the case at bar.

As far as the record discloses the juror Green was not challenged by counsel for defendant on *voir dire* examination, nor was objection then offered in any manner to his competency or qualifications. The objection made first appears in the motion for new trial and cannot be considered on appeal. [City of Tarkio v. Cook, 120 Mo. l. c. 11; State v. Brewer, 109 Mo. l. c. 652; Easley v. Mo. Pac. Ry. Co., 113 Mo. l. c. 246; Grove v. City of Kansas, 75 Mo. 672.] Counsel argue, however, that defendant was caused to exercise one of its peremptory challenges in removing him from the panel, "when, if he had answered fully, accurately and truthfully all questions asked him on his *voir dire* examination, he would have been excused by the court for cause, or at least defendant would have had an opportunity to have raised an objection to him." An examination of the authorities cited by defendant show that the facts in all thereof are dis-

tinguishable from the situation here present. There the juror was either challenged for cause, had expressed a prejudice, or had participated in the verdict. Here the court below was never requested to reject the juror; there was no showing of bias or prejudice, either on his *voir dire* examination or by the affidavits filed, but on the contrary on *voir dire* he unequivocally stated several times that he was not prejudiced; and, he did not sit as a juror in the trial of the case.

Defendant urges that it was "entitled to a panel of eighteen qualified men from which the jury is to be struck." This without question is the law. But, in the instant case, there was no proof of disqualification on the part of Juror Green. And moreover, while the question is not before us, we are nevertheless of the opinion, based upon the adjudicated cases, that even though he had been challenged on the facts disclosed by the affidavits filed, such challenge should properly have been overruled. [McManama v. Railroad, 175 Mo. App. 43; Kennelly v. Kansas City Rys. Co., 214 S. W. 237; Hudson v. Railroad, 53 Mo. 525; Albert v. Terminal Railway Co., 192 Mo. App. 665; In re Bowman, 7 Mo. App. 569; Tawney v. United Railways, 262 Mo. 602; State v. Green, 229 Mo. 642.] We therefore rule the point against defendant.

II.   Defendant next contends that the court erred in giving instruction numbered 1, requested by plaintiff. Said instruction is as follows:

"You are instructed by the court that under the law it was the duty of the defendant's conductor in charge of the car in question, while said car was standing at Armour Station to receive passengers, **Embracing Allegations.** to exercise the highest degree of care to allow persons engaged in boarding said car as passengers, a reasonably sufficient length of time to safely board the same, that is, to reach a place of reasonable safety thereon, before starting said car forward, and a failure by the conductor to do this would constitute negligence on his part.

"Now, therefore, if you believe and find from the evidence that at the time in question the defendant's street car in question was stopped at Armour Station to take on passengers, and that while said car was standing there (if you so find) plaintiff attempted to board said car at said station for the purpose of becoming a passenger thereon; and that before plaintiff was able to or did safely board said car (if you so find) defendant's conductor negligently (if you so find) caused said car to start forward and negligently (if you so find) closed the door of said car while said car was moving, and that as a direct result thereof the plaintiff was thrown from said car to the street below and injured and if you further find that his said injuries (if any) were directly caused by negligence on the part of the defendant's conductor as herein submitted (if you find said conductor was negligent as herein submitted) and that plaintiff was at all times in the exercise of ordinary care for his own safety, then you are instructed by the court that your verdict must be in favor of the plaintiff and against the defendant."

Defendant maintains that the gist of, or specific allegation of, negligence charged in the petition, viz., "pushed plaintiff off the step" is omitted from the instruction, thereby making the same broader than the pleadings. To this we cannot give assent. The allegation mentioned is not the sole act of negligence pleaded by the petition. It also contains the allegations that the car was prematurely started forward, that the door was closed while the car was moving, and that as a result thereof plaintiff was thrown violently from the car to the street below. All of these allegations are specifically, and almost literally, covered by the instruction, under which the jury were required to find that the "conductor negligently caused said car to start forward and negligently closed the door of said car while said car was moving, and that as a direct result thereof the plaintiff was thrown from said car to the street below

and injured.'' Under the state of the proof adduced, when the jury were required to find that the plaintiff was ''thrown from'' the car, that was fairly alike in significance to requiring them to find that he was ''pushed off'' the car, and we do not believe they could have been misled. The criticism amounts to a distinction without a practical difference.   We accordingly hold that the instruction is within the limits of the petition, and does not constitute reversible error.   [Johnson v. Railway, 177 Mo. App. 298; Ottofy v. Trust Co., 196 S. W. 428; Riley v. Independence, 258 Mo. l. c. 682-684; Little v. Railroad, 139 Mo. App. l. c. 55; Quinley v. Traction Co., 180 Mo. App. l. c. 300-302; Schwanenfeldt v. Street Railway, 187 Mo. App. l. c. 592, 593.]

III.   Defendant insists that the court erred in refusing to give to the jury the peremptory instruction, directing a verdict in favor of defendant, requested at the close of all the evidence, because the physical facts as testified to show that plaintiff could not have been injured as claimed.   In support of this insistence defendant argues substantially thus:   That the elevated platform was fifty to fifty-five feet long and the street car about forty feet in length; that plaintiff's testimony was that while he was standing on the step of the car it started and ran twenty-four to thirty feet, when he fell; that witnesses for plaintiff testified that he fell when the car was from twenty-four to thirty feet beyond the platform; that the ''back end of this car under the undisputed testimony was at least forty feet east of the west side of this elevated structure;'' that if he had boarded the car when it was standing still and had ridden on it but twenty-four to thirty feet, he would have fallen at least ten feet east of the west edge of the platform; and that the only way that he could have ridden on the car while it moved twenty-four to thirty feet and then have fallen twenty-four to thirty feet west of the platform, ''was for him to have boarded the moving car at the west side of

*Peremptory Instructions.*

this elevated structure, as testified to by the six witnesses produced by the defendant.'' In advancing this argument defendant evidently misinterprets the testimony of some of its own witnesses when it contends that it was ''undisputed'' that the back end of the car ''was at least forty feet east of the west side'' of the platform. Witness Heinzman testified that the man running to catch the car rode about ten feet ''on the platform'' before he fell, which would have placed the back end about ten feet east of the west edge of the platform. Witness Wilhite said that he rode about eight or ten feet, but further says that when he undertook to grab hold of the car it had run ''about twenty-five or thirty feet from the east end of the viaduct,'' which would have placed it about midway of the platform. Witness Shindler stated that when the car stopped to receive passengers the rear vestibule thereof was about even with the door of the shelter house, which other testimony shows was about the middle of the platform. Therefore, according to the testimony of witnesses Shindler and Wilhite, when plaintiff boarded the car the rear vestibule must have been twenty-five feet or more from the west edge of the platform; and, plaintiff having testified that he rode twenty-four to thirty feet and fell when about six feet beyond the platform, which would be substantially accurate, it cannot be said at a matter of law that it was a physical impossibility for him to have fallen as claimed. Clearly the question was one for the jury, and the demurrer to the evidence was properly overruled. [Swigart v. Lusk, 192 S. W. l. c. 141; Hays v. Railway, 182 Mo. App. l. c. 403; Clark v. Long, 196 S. W. l. c. 412; Ganey v. Kansas City, 259 Mo. l. c. 660, 661.]

IV. Defendant urges that the court erred in refusing to sustain the motion for new trial because of misconduct upon the part of plaintiff's counsel in mak-

ing prejudicial and improper argument to the
jury, and that it further erred in failing to
reprimand counsel therefor. With respect to
this complaint the record shows that during the clos-
ing argument of counsel to the jury, the following oc-
curred:

*Argument to Jury.*

"MR. HOGSETT: The jury would never live long
enough to sit on a jury in a case against the Kansas
City Railways Company when that company would come
in without a defense of some kind.

"MR. PREWITT: I object to that statement as out-
side of the record, wholly incompetent, prejudicial and
improper argument, and ask that counsel be reprimand-
ed for making such a remark.

"THE COURT: Proceed.

"To which action and ruling of the court the de-
fendant, by counsel, then and there at the time duly
excepted and still excepts.

"MR. HOGSETT: Let the remark be withdrawn, and
I will substitute in place of it this, gentlemen, the same
in effect, but in a different phraseology that may suit
my brother: This company cannot be expected in this
case to come into court and admit liability. They must
make a defense, they must select from the eight wit-
nesses to this accident, outside their train crew, the
best that they can get, who will tell a story favorable
to them."

As to the propriety and effect of the statement
made by counsel for plaintiff, the trial judge, who heard
the remarks of opposing counsel, was in a better po-
sition to determine than are we, and he evidently did
not consider the same prejudicial. Nor, from what is
before us, are we of the opinion that he was guilty of an
abuse of discretion in failing to reprimand counsel. In
our judgment, based upon the fragment of the speech
quoted, the remark made was not sufficient to have in-
fluenced the jury in arriving at their verdict. Further-
more, when counsel for defendant objected to the ar-

Pietzuk v. K. C. Railways Co.

gument, the remark was at once withdrawn by counsel who made it, and, without objection, another statement was substituted in lieu thereof. If there was any transgression we are constrained to hold that it was cured by such withdrawal. [Grace v. Railway, 212 S. W. l. c. 42; Griggs v. K. C. Rys. Co., 228 S. W. l. c. 513; Sinclair v. Telephone Co., 195 S. W. (Mo. App.) 558; Hollenbeck v. Railway, 141 Mo. l. c. 107; Nance v. Sexton, 203 S. W. (Mo. App.) 649; 38 Cyc. 1502.]

V. Defendant next claims that the court erred "in refusing to sustain the motion for a new trial on the grounds that the verdict and judgment are contrary to the greater weight of the evidence and because the jury in arriving at their verdict wholly disregarded the instructions given by the court." In support of the first half of this contention defendant argues that where the verdict is against the weight of testimony to such an extent that it raises "a presumption of prejudice, corruption, or gross negligence on the part of the jury," the appellate court has the right to interfere with the same. Aside possibly from the excessiveness of the verdict, which we will discuss *infra,* the record in this case is wholly devoid of anything which could give rise to a logical assumption, much less a presumption, that the jury was prejudiced, or corrupt, or grossly negligent. Defendant stresses the fact that the three eye-witnesses for plaintiff all testify to the same facts and that opposed to that testimony defendant has "the positive testimony of six witnesses." The rule that the weight of testimony is not to be determined by the mere number of witnesses has been so firmly established in our system of jurisprudence that it is useless to cite authority in support thereof. And, as none of the witnesses for defendant, with the possible exception of the conductor, identified plaintiff as the man they saw running after the car, the pro-

*Greater Weight of Evidence.*

bative·value of their testimony is not necessarily great-
er than that of the witnesses for plaintiff.

The verdict for plaintiff was unanimous.  The trial
court overruled defendant's motion for new trial, in
which it was urged that the verdict was against the
greater weight of the evidence.  Thereafter defendant
filed another motion to set aside the order overruling
its motion for new trial, in which it was again urged
that the verdict was contrary to the greater weight of
the evidence,  which motion was also overruled.  The
trial court has thus passed twice upon that question.
And, there being substantial testimony to support the
verdict, it is not for this court to weigh the evidence
or usurp the power of the jury and substitute its judg-
ment for that of the jury.  [Linderman v. Carmin, 255
Mo. 1. c. 71; Norris v. Railroad, 239 Mo. 695; Vincent v.
Means, 207 Mo. 709.]  The defendant having failed to
point out any respect in which the jury "disregarded
the instructions given by the court" we shall not discuss
that question.

VI.  Defendant's final contention is that the verdict
is excessive.

With respect to the nature and extent of plaintiff's
injuries and loss of earning power, his testimony showed
the following:. That he sustained a broken jaw, five or
six teeth knocked out, a broken chest, and his legs were
hurt; that as a result of his injuries he had
been unable to do any work for more than two
years, that his chest pained him, his legs ached,
and when "I bend over my head begins to roar and gets
dizzy;" that one side of his jaw was higher than the
other; that not until about August or September, 1918,
was he again able to work and he then secured employ-
ment at Morris & Company, putting sacks on beef, but
could only work "a day or two and have to rest a day."

Dr. H. L. Regier, police surgeon of Kansas City,
Kansas, a witness for plaintiff, testified that he saw

plaintiff the night of the accident at St. Margaret's Hospital, Kansas City, Kansas; that he was unconscious, bleeding from the ear, had a broken lower jaw, some teeth knocked out, and was bloody; that "I took for granted, while I wasn't quite sure, on account of him bleeding from the ear, that he must have had a fracture of the base of the skull;" that the principal thing witness did was to wire his lower jaw; that he "didn't entertain the idea" that plaintiff was under the influence of liquor. Witness stated that he did not remember having told Claim Agent Frank Wisdom that he found plaintiff under the influence of liquor.

Dr. C. E. Saunders, physician and surgeon, a witness called by plaintiff, testified that he first attended plaintiff at St. Mary's Hospital, Kansas City, Missouri, three days after the accident; that plaintiff was then under his care "continously up until about the 4th or 5th day of May; I saw him every day, and then after that he came to the office about every second or third day until the middle of June, and then I have seen him up to the time I went into the service (July, 1918) on an average of about once a month;" that plaintiff had a compound fracture of the lower left jaw, a fracture at the base of the skull, several teeth loosened, with three or four knocked out, and numerous bruises; that he had hemorrhage from the ears and from the nostrils, dilated or irregular pupils, a tooth driven into the bone of the lower jaw, and a little piece of bone broken off the upper jaw; that infection set in in the jaw; that the condition of the fracture of the skull was "always very serious and the outcome questionable, and in Julius's case I figured he had a 50-50 chance;" that they wired plaintiff's lower jaw to the upper jaw and fed him through a tube, through an opening in the front teeth, for four or five weeks. The witness further stated that about a week before the trial he had examined plaintiff and found that the union of the bone of the jaw was not in perfect apposition, "one fragment is a little higher than the other fragment, which throws his teeth

289 Mo.—11

out of line," one side being between an eighth and a quarter of an inch below the other and the two not touching; that he "has a discharging abscess from the gum, . . . quite a little infection around a good many of his teeth, . . . is extremely nervous, has exaggerated reflexes, the patella reflexes, which shows an extreme irritability of the cerebro-spinal canal, that is, the spinal cord; his symptoms are nervous complaints, or dizziness, headiness, and headache occasionally;" that "in stooping he seems to lose control of equilibrium to some extent." Asked to explain this latter, the witness said: "When you get a fracture of the base of the skull, or the fracture of any bone, you get a union of the bone, you get a deposit of the bone or bony tissue at the line of union. Part of that could be explained by the increased pressure from this deposit, and then the fact that he had a hemorrhage at the ear would indicate that this fracture at the base of the skull extended into what is known as the semi-circular canals which are located near the middle ear, and in these canals are nerve substances that have to do with equilibrium." Asked if this condition in plaintiff was permanent, the witness replied, "Yes, sir." Over the objection of counsel for defendant, in response to a question as to whether or not plaintiff could do "manual labor requiring that he stoop over," witness replied, "No; he can't do that kind of work; it would be dangerous." Being further examined, without objection by defendant, witness testified:

"Q. Explain why not, Doctor? A. Well, if he was working, he couldn't do that kind of work, especially if he had to work off the ground or around machinery, for fear of falling into machinery or falling from any scaffold that he might be working upon." Witness stated that the amount of his bill was $185.

Defendant offered no evidence with respect to the injuries sustained by plaintiff or relative to impairment of his earning power.

From the evidence it may fairly be deduced that plaintiff suffered severe pain, that the usefulness of his teeth has been seriously impaired and that there is more or less permanent impairment of his capacity for manual labor. However, when measured by the standards applied by this court in numerous cases, the verdict seems to us to be excessive. Prior to the accident plaintiff was earning, at $11 per week, $572 per annum. During the two and one-half years subsequent to his injury when he claims to have been unable to work, he would have earned $1430. The charge which he sustained for surgical and medical attention was $185, making a total loss to him, independent of pain and suffering, of $1615—$11,000, less the $1615 loss suffered, would leave $9385. This amount, invested at six per cent, would produce an annuity of $563, or within $9 of his total normal earning capacity.

Accordingly, if plaintiff will, within the next ten days, remit the sum of $4,000, so as to reduce the judgment to $11,000, the same will be affirmed as of the date thereof; otherwise, the judgment will be reversed and the cause remanded for a new trial. All concur.