**Jean EDLEY, Alice Forrester and Annalee Grady, Plaintiffs–Appellants,**

v.

**Robert Patrick O'BRIEN, M.D., Jerald Chaffin, M.D., and Steve Barker, C.R.N.A., Defendants–Respondents.**

No. 20067.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 14, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 7, 1996.

Application to Transfer Denied
April 23, 1996.

David W. Ransin, Springfield, for appellants.

Gail L. Fredrick, David C. Vaughn, III, Fredrick, Rogers & Vaughn, P.C., Springfield, for respondent O'Brien.

Bruce E. Hunt, Jeffrey S. Monroe, Burkart & Hunt, P.C., Springfield, for respondent Chaffin.

James W. Newberry, Schroff, Glass & Newberry, P.C., Springfield, for respondent Barker.

PARRISH, Judge.

Jean M. Edley, Annalee Grady and Alice Forrester (collectively referred to as plaintiffs), children of Daisy Keltner, deceased, appeal a judgment entered in favor of Robert Patrick O'Brien, M.D., Jerald D. Chaffin, M.D., and Steve Barker, C.R.N.A. (collectively referred to as defendants) in an action seeking recovery for the wrongful death of plaintiffs' mother.[1] Plaintiffs contend the tri-

---

1. Defendant Chaffin filed a motion to dismiss this appeal. The motion alleges that the appel-

al court committed error by failing to grant challenges for cause they directed to prospective jurors, failing to inquire or take remedial measures when allegations of juror misconduct were reported during trial, and in refusing to allow plaintiffs to present certain deposition testimony as rebuttal evidence. This court affirms.

On January 17, 1990, Daisy Keltner came to the emergency room of Skaggs Hospital in Branson, Missouri, complaining that she was having difficulty standing. She explained that she previously had a total knee replacement on the left side. The surgery had been performed eight years earlier. Mrs. Keltner believed the difficulty she was experiencing was attributable to the knee. She told the examining physician, Dr. Chaffin, that she had not been satisfied with her previous surgery.

Dr. Chaffin admitted Mrs. Keltner to the hospital. She was seen by an orthopedic surgeon, Dr. O'Brien, the next morning. Dr. O'Brien's diagnosis was that Mrs. Keltner's knee prosthesis was worn-out and dislocated. He recommended replacing the prosthesis. Mrs. Keltner agreed. Her surgery was scheduled for the next afternoon, January 19. Mrs. Keltner's surgery was to begin about 5:00 p.m., after other surgery Dr. O'Brien was scheduled to perform.

Mrs. Keltner's blood pressure was hypertensive after admission to the hospital. It became labile, going up and down. About 4:00 p.m. the afternoon of January 19, a nurse notified Dr. O'Brien of the status of Mrs. Keltner's blood pressure. Dr. O'Brien was involved in a busy surgery schedule when he received the information. He asked Dr. Chaffin to see Mrs. Keltner.

Dr. Chaffin examined Mrs. Keltner and ordered medication for her elevated blood pressure. After receiving the medication, Mrs. Keltner's blood pressure dropped only a little. Dr. Chaffin believed the elevated blood pressure was secondary to the impending surgery; that it was the result of the patient's anxiety and fear of surgery.

Dr. Chaffin communicated with Dr. O'Brien. Dr. Chaffin's assessment was that the patient's condition had been sufficiently controlled with medication; that there was no reason to postpone the scheduled surgery. Dr. O'Brien agreed. He did not believe the blood pressure presented an unreasonable risk.

Mrs. Keltner's surgery was delayed until about 7:30 p.m. because of Dr. O'Brien's other surgeries. Steve Barker, a Certified Registered Nurse Anesthetist, attended to Mrs. Keltner's anesthesia needs during surgery. He continuously monitored her blood pressure.

Mrs. Keltner was administered a spinal anesthetic that rendered her lower extremities without feeling but did not affect her central nervous system. She was awake and capable of talking and communicating throughout the surgery. The surgery was completed at approximately 10:10 p.m. Mrs. Keltner was returned to a recovery room. Her condition was stable. She was checked at approximately 11:30 p.m. There was no indication of neurological defect or stroke at that time. At 12:00 a.m. Mrs. Keltner appeared neurologically intact. She was alert, oriented and normal.

At 1:00 a.m. a nurse observed that Mrs. Keltner's speech was slurred and inappropriate. She was experiencing left-sided numbness and weakness. It was later determined that she suffered an ischemic stroke on the right side of her brain.

Mrs. Keltner was eventually transferred to a hospital in Springfield where she was placed under the care of another physician, Dr. Randall Halley. Dr. Halley managed Mrs. Keltner's medical care until she died September 21, 1990, some eight months after her surgery.

Plaintiffs contended defendants were negligent in proceeding with Mrs. Keltner's elective, non-emergency surgery while she was suffering from labile hypertension. They contended defendants were negligent in failing to recommend or require adequate blood pressure control before beginning sur-

lants' brief filed herein violates Rule 84.04(c); that the statement of facts in the brief is not fair

and without argument. The motion was taken with the case. It is denied.

gery; that allowing Mrs. Keltner's blood pressure to drop too fast and remain too low for too long caused the stroke that ultimately led to her death.

This case was tried before a jury. The jury returned a verdict in favor of defendants. Issues on appeal are directed to occurrences during jury selection, events during the course of trial relative to certain jurors' conduct and refusal to permit parts of a deposition taken by defendants to be read to the jury during plaintiffs' rebuttal. Facts relative to procedural issues will be stated in the parts of the opinion where those issues are discussed.

Forty prospective jurors participated in voir dire. Point I contends the trial court erred in denying seven of plaintiffs' challenges for cause. One of the challenged jurors, No. 39, was not included among the panel of eighteen prospective jurors or the panel of three prospective alternate jurors from whom the parties made peremptory strikes. *See* §§ 494.480.1 and 494.485, RSMo 1994. Of the six remaining prospective jurors who plaintiffs unsuccessfully challenged for cause, two, Nos. 10 and 24, served on the jury that tried the case.

Plaintiffs exercised peremptory challenges to exclude three persons they had unsuccessfully challenged for cause, Nos. 11, 18 and 31, from the panel of prospective regular jurors. They peremptorily challenged juror No. 33, who they also had unsuccessfully challenged for cause, in order to remove her from the panel of prospective alternate jurors.

Plaintiffs contend that the trial court erroneously denied their challenges for cause; that this denied them a full panel of qualified jurors from which to make peremptory challenges. They argue this was reversible error.

This matter was addressed by the western district of this court in *Rodgers v. Jackson*

Co. Orthopedics, Inc., 904 S.W.2d 385 (Mo. App.1995). The court held:

> [T]he right to exercise peremptory challenges from a full panel of qualified jurors is not a constitutional or a common law right; it is solely statutory in origin, and the Missouri statutes historically have limited that right to criminal cases only. A civil litigant does not have a right to a new trial if the trial judge requires him or her to use a peremptory challenge to remove a juror who should have been removed for cause.

*Id.* at 389.

The western district added, "Over the years a few Missouri courts, in *dicta*, have erroneously assumed that *civil* litigants have a similar statutory right to make their peremptory strikes from a venire of qualified jurors." *Id.* at 390 (emphasis in original), citing, as examples, two eastern district cases, *Holtgrave v. Hoffman*, 716 S.W.2d 332, 335 (Mo.App.1986), and *Golden v. Chipman*, 536 S.W.2d 761, 763 (Mo.App.1976), and one western district case, *Butler v. Talge*, 516 S.W.2d 824, 829 (Mo.App.1974).[2]

■ This district agrees with the holding in *Rodgers* that a litigant in a civil case does not have a right to a new trial because he or she was required to exercise a peremptory challenge to remove a prospective juror who should have been removed for cause. So long as an unqualified juror who was not removed based on a proper challenge · for cause does not serve in a civil case, there is no reversible error.

Since only two of the seven prospective jurors about whom plaintiffs complain, jurors No. 10 and 24, served on the jury, only their qualifications require review.

■ The standards for reviewing trial courts' rulings on challenges for cause are set forth in *Ray v. Gream*, 860 S.W.2d 325 (Mo. banc 1993).

---

2. Cases from the Supreme Court of Missouri and from this district have also stated, in *dicta*, that litigants in civil cases are entitled to a full panel of qualified prospective jurors from which to make peremptory challenges. *See, e.g., Vessels v. Kansas City Light & Power Co.*, 219 S.W. 80, 85 (Mo. banc 1920); *Murphy v. Cole*, 338 Mo. 13, 88 S.W.2d 1023, 1024 (1935); *Shields v. Kansas City Railways Co.*, 264 S.W. 890, 894 (Mo.1924); *Pietzuk v. Kansas City Railways Co.*, 289 Mo. 135, 232 S.W. 987, 992 (1921); and *Ozark Border Electric Co-op v. Stacy*, 348 S.W.2d 586, 590 (Mo.App.1961).

Trial courts are given broad discretion to determine whether prospective jurors are qualified, and rulings on that issue "will not be disturbed on appeal unless [they constitute] a clear abuse of discretion and a real probability of injury to the complaining party." *State v. Feltrop*, 803 S.W.2d 1, 7 (Mo. banc), *cert. denied*, [501] U.S. [1262], 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991); *State v. Walton*, 796 S.W.2d 374, 377 (Mo. banc 1990). Mindful that the trial court is in a better position to determine the qualifications of prospective jurors, doubts as to the trial court's findings will be resolved in its favor. *Walton*, 796 S.W.2d at 378. The critical question in reviewing the exercise of discretion is whether the challenged venirepersons indicated unequivocally their ability to evaluate the evidence fairly and impartially. *Feltrop*, 803 S.W.2d at 7; *State v. Lingar*, 726 S.W.2d 728, 734 (Mo. banc 1987).

*Id.* at 331–32.

■ Juror No. 10 was Brad Pollett. Plaintiffs contend Pollett admitted biases against persons filing claims for medical negligence; expressed the belief that the value of a loss from wrongful death of a parent could not be translated into a monetary loss; admitted biases that would treat claims against doctors arising out of medical acts of negligence differently than negligence claims against other persons for other types of negligent acts.

Plaintiffs' attorney explained to the prospective jurors that the claim being tried sought recovery for wrongful death. He told the prospective jurors, "This is a death claim where someone was injured, suffered injuries, required medical care, treatment, was disabled, eventually died, over about eight months, and it's a claim being brought by the surviving daughters, my clients, for not only the claims that the lady had for her own problems and losses, but also theirs for loss of their mother." He followed that explanation with the two questions, "Is there anyone here who feels that someone should not be permitted to come into court if they feel they've been done wrong and seek recovery for a parent's death?"; and, "Anybody have a moral or religious or just some type of par-ticular scruples or convictions that that shouldn't be permitted?"

Six prospective jurors, including Mr. Pollett, responded. However, Pollett was asked no follow-up questions. The other five persons were asked additional questions.

Later in his voir dire inquiry, plaintiffs' attorney asked, "Does anyone feel that if you are forced to suffer such a loss [a loss resulting from the death of an older person] as a result of someone being careless that that is not a loss that can be translated into a monetary amount? Anybody feel that way?"

Three persons responded. One of those responding was Mr. Pollett. A fourth prospective juror asked that the attorney clarify the question. The attorney responded to the request by asking, "Do you feel, if you were asked to translate into monetary terms the loss a survivor or a surviving child believes they sustained, if you believe there was a loss for that non-financial support and guidance and counsel, would you, because of your scruples, be prohibited or unable or terribly uncomfortable in translating that into a dollar amount?"

Mr. Pollett did not respond to the second question. Although plaintiffs' attorney questioned the other panel members who had responded to the initial question, he posed no questions to Pollett.

Later in plaintiffs' voir dire, the attorney asked, "[S]hould the person who has been injured, disabled, or killed for that matter have any less right to make it—to right the situation and be compensated if it is a private citizen in an automobile or a doctor in a hospital? Should those two situations be different simply because we're dealing with doctors versus automobiles? Anybody feel that way?"

Mr. Pollett and one other panel member responded. The attorney followed up with inquiries to the other person, but asked Pollett no questions.

Near the end of plaintiffs' voir dire the attorney asked, "Is there anything that hasn't been covered that someone has in their mind, a thought or a belief, scruples, morals, religious, philosophical or otherwise,

that makes you feel that maybe you really shouldn't be on this jury, and that you might be disadvantaging one side or the other?" Four people, including Mr. Pollett, responded. Pollett was asked no follow-up questions.

Plaintiffs' voir dire concluded with questions concerning whether there were additional reasons why panel members should not serve as jurors in the case. Mr. Pollett answered, explaining, "I'm a student in college in Springfield, and obviously anytime I'm not there I miss a lot of valuable information, and also that counts against me as a student through my teachers. In fact, I missed an exam this morning."

Later, the attorney for one of the defendants asked the prospective jurors if any of them believed they could not sit and listen to the evidence and, regardless of their individual beliefs, decide the case based on what they would hear from the witnesses and see from the exhibits. Several panel members responded that they could not. Mr. Pollett did not respond.

At the conclusion of the voir dire, the trial judge entertained challenges for cause. In challenging Pollett, plaintiffs' attorney stated, "Pollett was indicating both his personal hardships insofar as his current profession, being a student and mid-terms and such; in addition, he commented that he felt doctors need to be treated as special people, and I think those two things taken together very, very clearly indicate his strong underlying bias." The attorney for one of the defendants questioned plaintiffs' characterization of Pollett pointing out that he said nothing about treating doctors as special people. He suggested that although Pollett would be subjected to some hardship, he should not be excused for cause.

The trial court took no action on the request to excuse Pollett for cause. It delayed addressing questions of hardship until there was a determination of the number of prospective jurors qualified to serve. When the trial court later reviewed the hardships claimed by the various prospective jurors, it did not excuse Mr. Pollett.

Juror No. 24 was Christy Lawrence. Plaintiffs' complaints as to Ms. Lawrence are directed to her disclosure that she had been treated by one of the defendants, Dr. O'Brien. Point I contends the trial court erred in not excusing prospective jurors "who themselves and members of their families were past, present and/or possibly future patients of one or more of the defendants."

During voir dire plaintiffs' attorney asked, "Has anybody here ever been a patient of Doctor O'Brien, other than those that we've just spoken to?" Three people responded. One of those responding was Christy Lawrence. She was then asked the following questions and gave the following answers:

Q. ... Ms. Lawrence, you indicated you knew Doctor O'Brien.

A. Yeah. I broke my arm, and he set it, and it's been about six years ago.

Q. It didn't require surgery?

A. No, no.

Q. Any other members of your family been back to him or anything?

A. No.

Q. Okay. If you sat on the jury and felt that the law and the evidence directed your need to sign a verdict in favor of the plaintiffs in this case, would that affect you if you felt like you ever wanted to go back to Doctor O'Brien?

A. No, no.

Q. Okay, you hesitated a little bit—

A. —Well, I just think—no, no.

■ The trial court did not abuse its discretion by not granting plaintiffs' challenge for cause of Brad Pollett. Pollett, along with the other prospective jurors, was asked if he could put aside individual beliefs and decide the case based on what was presented at trial. Anyone who believed they could not was asked to respond. Pollett did not respond. The trial court, being in a better position than this court to evaluate the responses, could have found that to be an unequivocal indication that Pollett could evaluate the evidence fairly and impartially.[3]

**3.** The dissent suggests that Pollett's failure to respond to the inquiry of whether he could put

aside his beliefs and decide the facts based on the evidence adduced from witnesses and exhibits

■ The same is true with respect to plaintiffs' challenge for cause of juror No. 24, Christy Lawrence. The fact that she had been a patient of one of the defendant doctors did not disqualify her from serving as a juror. *Morris v. Spencer*, 826 S.W.2d 10, 11–13 (Mo.App.1992). The trial court's denial of the challenge for cause was not an abuse of discretion. Point I is denied.

■ Point II is directed to juror conduct during trial. Point II alleges the trial court erred in failing "to undertake any inquiry and/or remedial measures during trial when jury misconduct was twice reported to the trial court, and in denying plaintiffs' after-trial motions, ... in that, the court ... failed to institute any remedial measures to correct and maintain control of the jury, and failed to issue its own instructions to the jury after two separate instances of extra-judicial communication with one or more jurors had been reported to the trial court, and after completion of the trial the trial court was fully informed by unopposed affidavit that members of the jury directly violated the strict admonition of MAI 2.01 by discussing the facts and parties related to the case amongst themselves and with others prior to formal deliberations."

On the third day of trial the attorney for defendant Chaffin reported an incident that had come to his attention. He told the trial judge that a local physician, Dr. Givens, had been observed in the hallway during a break in the proceedings. Dr. Givens was reported as "having apparently at least one conversation or maybe a comment around the jury about I guess this case." The attorney told the trial court he did not know what had been said, but the mother of one of the defendants overheard some comment by Dr. Givens in the presence of members of the jury.

Dr. Chaffin's attorney told the court, "I don't believe he's [Dr. Givens] an anticipated witness on behalf of the plaintiffs, but I think I'm compelled to at least report what I've been told to the Court, and I think maybe the best way to go would be to, if in your discretion you want to suggest to him to refrain from further communications. I have no reason to believe there's been any spoilage of the jury or anything of that sort, but I am concerned that it could continue."

The trial judge permitted the person who had overheard the remark to advise the court of her observation. She stated that she heard Dr. Givens make a remark to "about three jury members." She was under the impression that the jurors were not supposed to talk to anyone so she walked by where they were standing. She heard Dr. Givens say that Barker (one of the defendants) had been gone from the area "for three or four years, or five years, something like this." The person who heard the conversation said she knew from the remark that they were talking about the case.

The trial judge asked the attorneys if they were asking for any relief from the court. Plaintiffs' attorney did not request relief. The attorney for one of the defendants asked the trial court to request the physician to have no discussion concerning the case with the jury. The trial judge instructed the bailiff to advise Dr. Givens that the judge had asked that he not talk to the jury members.

The other incident during trial that was brought to the judge's attention occurred on the final day. Plaintiffs' attorney reported that throughout the trial a parent of one of the defendants had conversed with members of the jury. The attorney advised the trial court that he believed he was obligated to bring the matter to the court's attention and make a record.

"does not constitute an avowal to follow the instructions of the court."

Pollett was not asked if he could follow the instructions of the court. Just as there was no avowal that he could follow the instructions, there was no manifestation that he could not. However, MAI 2.03, an instruction required to be given in all jury cases, directs jurors that the court's instructions constitute the law of the case and are binding on them. Jurors are presumed to follow the instructions of the trial court. *Lester v. Sayles*, 850 S.W.2d 858, 875 (Mo. banc 1993) (Covington, J., concurring in part and dissenting in part); *Switzer v. Switzer*, 373 S.W.2d 930, 937 (Mo.1964); *Bowers v. Etherton*, 216 S.W.2d 83, 86 (Mo.1949); *Jacobs v. Danciger*, 344 Mo. 1042, 130 S.W.2d 588, 591 (1939).

**906**

The trial judge asked the attorney what relief he wanted. He answered, "If those in the courtroom could be generally instructed, I think that would be sufficient, because I don't think it's necessary to bring it up with the jury themselves." The trial judge asked the attorney what instruction he wished. He answered, "To not have any conversation besides 'Hello' or 'Hi'."

The trial judge then instructed the spectators in the courtroom, "Those in the courtroom should refrain from speaking with jury members." Plaintiffs' attorney told the court, "Thank you."

When the incidents about which plaintiffs now complain occurred, the trial judge inquired of each attorney concerning their requests for relief. On each occasion the requested relief was granted. No requests were made for mistrial. "A party may not assert as error that the trial court failed to do more than was requested." *Wulfing v. Kansas City Southern Industries, Inc.,* 842 S.W.2d 133, 159 (Mo.App.1992). *See also Higgins v. Terminal R.R. Ass'n of St. Louis,* 362 Mo. 264, 241 S.W.2d 380, 386 (1951). The trial court committed no error in its actions regarding the reports made during trial of possible juror misconduct.

Plaintiffs also contend in Point II that the trial court erred in denying after-trial motions based on jury misconduct disclosed by a juror's affidavit filed as part of plaintiffs' suggestions in support of their motion for new trial and motion for judgment n.o.v. The affidavit states that during recess throughout the trial, the affiant and one other named juror "and other jurors whose names [affiant] cannot recall, discussed the evidence and testimony of this case." It states that the affiant did not understand, and other jurors appeared not to understand, that such discussions were not permitted.

A juror's testimony or affidavit is inadmissible to impeach a verdict. *Wingate v. Lester E. Cox Medical Center,* 853 S.W.2d 912, 916 (Mo. banc 1993). However, no objection was made to the affidavit tendered to the trial court. When parties fail to object to the admissibility of an affidavit submitted for that purpose, it may be considered. *Middle-*

*ton v. Kansas City Public Service Co.,* 348 Mo. 107, 152 S.W.2d 154, 158 (1941); *Green v. Lutheran Charities Ass'n,* 746 S.W.2d 154, 157 (Mo.App.1988).

The affidavit, however, does not warrant relief. It is not specific in that it does not reveal the nature of matters allegedly discussed between affiant and the other named juror nor the identities of or subjects discussed by other jurors. It is speculative as to other jurors' understanding. An affidavit lacking in specificity that does not disclose subject matters of discussions to which it is directed is not sufficient to permit relief. *Green, supra; Bailey v. Hilleman,* 566 S.W.2d 504, 505–06 (Mo.App.1978). Point II is denied.

Point III contends the trial court erred in not permitting plaintiffs to use selected portions of the deposition of Dr. Roy Holand and not permitting them to admit Plaintiffs' Exhibit No. 72 as rebuttal evidence.

Dr. Holand's deposition was taken by defendants but not used as evidence in their case. The selected parts of the deposition that plaintiffs sought to use in rebuttal contain his opinions that: (1) Mrs. Keltner's blood pressure instability posed an additional risk for her surgery; and (2) postponing Mrs. Keltner's surgery would not have exposed her to new and different risks.

Plaintiffs' Exhibit No. 72 is an enlargement of a question from Dr. Holand's deposition, "Would you agree that given Daisy Keltner's presentation and change from Thursday night to Friday night, that you could definitely assess there was an increased risk of stroke?" The question is followed by answers attributed to Dr. O'Brien and Dr. Rogers—a witness who testified on behalf of defendant Dr. O'Brien—intended to show that they each answered the question negatively at trial.

Plaintiffs argue that the evidence they tendered in rebuttal went to new issues that were first raised in defendants' case, viz., (1) whether postponement or cancellation of the surgery would have exposed Mrs. Keltner to risk of further injury or disease; and (2) whether proceeding with the surgery as scheduled without further blood pressure

control subjected Mrs. Keltner to increased risk of stroke.

 "Rebuttal evidence is evidence tending to disprove 'new points first opened by' the opposite party." *Peters v. Dodd,* 328 S.W.2d 603, 610 (Mo.1959), quoting *Christal v. Craig,* 80 Mo. 367 (1883). Trial courts have considerable discretion in excluding or admitting rebuttal testimony which was available and should have been offered in the case in chief. *Bean v. Riddle,* 423 S.W.2d 709, 719 (Mo.1968).

 "[W]hile the court may in its discretion admit in rebuttal evidence which more properly should have been introduced in chief, it may, in its discretion, and generally should, decline to permit either party to introduce evidence in support of his case in chief on rebuttal." *Id.* Evidence that is merely cumulative to that offered in chief is not generally admissible in rebuttal. *Id.*

 Plaintiffs' case in chief included evidence that Mrs. Keltner was at substantial and unreasonable risk of stroke because her surgery progressed before her blood pressure was properly controlled. Defendants' evidence that proceeding with surgery did not subject Mrs. Keltner to increased risk of stroke was contradictory of plaintiffs' evidence. It did not raise a new issue.

 Likewise, defendants' evidence that to have delayed the surgery would have exposed Mrs. Keltner to risk of further injury or disease did not raise a new issue. It was a response to plaintiffs' assertion, during their case in chief, that proceeding with the surgery as originally scheduled was unreasonable. "A party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence...." *Gassen v. Woy,* 785 S.W.2d 601, 605 (Mo.App.1990).

The evidence plaintiffs sought to present in rebuttal was cumulative of evidence presented in their case in chief. The trial court did not abuse its discretion by denying plaintiffs' request to use selected portions of Dr. Holand's deposition in rebuttal and refusing to admit Plaintiffs' Exhibit No. 72. No error was committed. Point III is denied.

Point IV contends the trial court erred and committed plain error in any one or more of the respects asserted in Points I, II, and III; that the cumulative effect of those actions "caused serious and substantial manifest injustice" so as to deny plaintiffs a fair trial.

The issues Point IV reasserts have been fully addressed. They gain no stature from an attempted cumulative transmogrification. *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852, 871 (Mo. banc 1993); *Baker v. Ford Motor Co.,* 501 S.W.2d 11, 18 (Mo.1973); *Gathright v. Pendegraft,* 433 S.W.2d 299, 316–17 (Mo.1968); *Chism v. Cowan,* 425 S.W.2d 942, 950 (Mo.1967). Point IV is denied. The judgment is affirmed.

CROW, J., concurs.

SHRUM, C.J., dissents in separate opinion filed.

SHRUM, Chief Judge, dissenting.

I respectfully dissent. Unlike the majority, I believe the trial court did abuse its discretion by not granting plaintiffs' challenge for cause of Juror Pollett.

"Under our system of jurisprudence there is no feature of a trial more important ... than that every litigant shall be accorded a fair trial before a jury ... who enter upon the trial totally disinterested and wholly unprejudiced." *Theobald v. St. Louis Transit Co.,* 191 Mo. 395, 90 S.W. 354, 359 (1905). Consequently, "[p]ersons whose opinions or beliefs preclude them from following the law as declared by the court in its instructions [are among those who] are ineligible to serve as jurors on that case." § 494.470.2, RSMo 1994.

In *Theobald,* our Supreme Court said:
"The question of the qualification of a juror is a question to be decided by the court, and not one to be decided by a juror himself. It is the prerogative and duty of the trial court to exercise a wise, judicial discretion in this regard, and the conclusion of the court should rest upon the facts stated by the juror with reference to his state of mind, and should not be allowed to

depend upon the conclusions of the juror as to whether or not he could or would divest himself of a prejudice he admitted existed in his mind. And this is true whether the prejudice exists against either of the parties or against the character of the subject-matter in litigation, or against either of the parties as a class, and not against the party as an individual. It is proper to examine a juror as to the nature, character, and cause of his prejudice or bias, but it is not proper to permit the juror, who admits the existence in his mind of such prejudice or bias, to determine whether or not he can or cannot, under his oath, render an impartial verdict. Such a course permits the juror to be the judge of his qualifications, instead of requiring the court to pass upon them as questions of fact."

*Theobald,* 90 S.W. at 359.

More recently, the Supreme Court has cited and explained *Theobald* in *Ray v. Gream,* 860 S.W.2d 325 (Mo. banc 1993):

"The key point of *Theobald* is not that the court is prohibited from basing its determination on the opinions or conclusions of the jurors, but that the trial court must make an independent determination of the jurors' qualifications. That task is accomplished when the trial court reviews and evaluates the jurors' conclusions and weighs them against the earlier admissions of prejudice. It is in that sense that the requirement for an independent determination is not inconsistent with the court's reliance on those conclusions.

"In some cases, such as *Theobald,*[ ] the initial indication that a juror is prejudiced may be so strong as to require more than the testimony that the prejudice can be set aside. In these instances, the opinion or conclusion of the jurors must be discounted, at least to some extent, and absent other evidence that the juror could in fact serve impartially, the challenge for cause should be sustained."

*Id.* at 334. (footnote omitted).

I view Juror Pollett's first indications of bias, as recited in the majority opinion, to be as strong as those in *Theobald,* thus requiring more evidence than was adduced here to overcome them. The sole rehabilitative question posed to the panel and relied upon by the majority was phrased thusly:

"I need to know if you think in your mind and heart that I can sit and listen to the evidence in this case and regardless of what my beliefs may be or may not be, I can be fair to all parties and I can decide based not on arguments, not on catch phrases, but based on what I hear from the witnesses and what I see from the exhibits.

"Now, is there anybody here that can't do that?"

The trial court's decision that Juror Pollett was qualified to serve was based solely on Pollett's failure to respond affirmatively to this single question. Although Pollett did not respond, his silence does not constitute an avowal to follow the instructions of the court. *See* 494.470.2, RSMo 1994. The rehabilitative question was incomplete as it did not inquire of the jury panel whether they could follow the instructions of the court; consequently the reasonable inferences that can be drawn from Pollett's silence do not permit a complete evaluation of his qualifications. Moreover, there is no avowal by Pollett anywhere in the record that he would follow the instructions of the court. In summary, Pollett stated no facts from which it can be inferred that he could or would follow the law.

While *Gream* instructs that the trial court may rely on jurors' self-assessments, it also teaches that such reliance is unjustified in cases of strong prejudice. I believe that the facts here mirror the latter situation. Under the circumstances, I would hold that the court's singular dependence on Juror Pollett's opinion of his own qualification was an abuse of its discretion, that the challenge for cause should have been sustained, and that prejudicial error resulted. I would reverse and remand.