**Elaine KHOURY and Alex Khoury, Appellants,**

v.

**CONAGRA FOODS, INC., Respondent.**

**No. WD 73084.**

Missouri Court of Appeals,
Western District.

March 6, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 1, 2012.

Application for Transfer
Denied July 3, 2012.

Kenneth B. McClain, Independence, MO, Susan Ford Robertson, Kansas City, MO, for Appellants.

Stephen Torline, William Lynch, Ryan Watson, Kansas City, MO, Jerry W. Blackwell, Corey L. Gordon, Elizabeth J. Citurs, Minneapolis, MN, for Respondent.

Before Division II: GARY D. WITT, Presiding Judge, and JOSEPH M. ELLIS and MARK D. PFEIFFER, Judges.

MARK D. PFEIFFER, Judge.

Elaine and Alex Khoury ("the Khourys") appeal from the judgment of the Circuit Court of Jackson County, Missouri ("trial court"), upon a jury verdict in favor of ConAgra Foods, Inc. ("ConAgra"), on the Khourys' personal injury claim for damages. The Khourys claim, first, that the trial court erred in restricting or refusing certain rebuttal evidence they offered at trial; and, second, that the trial court erred in removing a juror and replacing him with an alternate juror after the jury was empanelled but before any evidence in the trial was presented. The Khourys ask this court to overturn the jury's verdict and reverse the trial court's judgment entered thereon and to remand for a new trial. We conclude that the trial court did not abuse its discretion in either instance; thus, we affirm.

## Facts and Procedural History[1]

The Khourys sued ConAgra to recover damages for Mrs. Khoury's personal injuries from lung disease called bronchiolitis obliterans, allegedly caused by exposure to chemical vapors during her preparation and consumption of ConAgra's microwave popcorn, which contained butter flavoring and chemical ingredients, including diacetyl, and for Mr. Khoury's loss of consortium.

The day prior to voir dire, the trial court and the parties' trial counsel agreed that counsel would investigate overnight the venire panel members' litigation history using Missouri's automated case record service, Case.net, and then determine the next morning whether any of the eighty panel members may have failed to answer questions regarding prior litigation experience. Voir dire began the afternoon of July 6, 2010, and continued through July 7, 2010. The individual venire members were questioned about information found on Case.net, the parties exercised their peremptory strikes and strikes for cause, and the jury—consisting of twelve jurors and four alternates—was empanelled.

The next morning, on July 8, 2010, in the courtroom out of the presence of the jury and prior to opening statements, counsel for ConAgra informed the trial court that counsel had found, separate and apart from litigation history information, that Juror Piedimonte had a Facebook page and was "a prolific poster for anti-corporation, organic foods." ConAgra moved for a mistrial or, in the alternative, to strike Juror Piedimonte because of his alleged misconduct[2] during voir dire, claiming he intentionally failed to disclose information that affected his ability to be a fair and impartial juror. The trial court and counsel for the parties questioned Juror Piedimonte, after which, counsel for ConAgra renewed its motion based on Juror Piedimonte's alleged intentional nondisclosure. The trial court denied the motion for mistrial but sustained the motion to strike; Juror Piedimonte was excused and the trial proceeded over the next three weeks with twelve jurors and three (instead of four) alternate jurors.

During the Khourys' case-in-chief, medical expert witnesses Dr. Allen Parmet and Dr. David Egilman testified on the issue of causation, both opining to a reasonable degree of medical certainty that Mrs. Khoury had bronchiolitis obliterans caused by exposure to butter flavorings released from the popcorn bags. The Khourys did not call Mrs. Khoury's treating pulmonologist, Dr. Francisco Remy, during their case-in-chief.

The Khourys compared Mrs. Khoury's exposure to butter flavoring chemicals to the chemical exposure of quality assurance workers in microwave popcorn plants. Dr. Egilman testified about the Lockey Study, a paper summarizing the results of Dr. Lockey's study of airway obstruction in

---

1. We view the facts in the light most favorable to the jury's verdict. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 455 (Mo. banc 2006).

2. As our ruling today reflects, the record is not at all clear that Juror Piedimonte intentionally misled the court or the parties' attorneys at any time. Instead, our ruling today merely confirms that the trial court acted within the bounds of its discretion in concluding, out of an abundance of caution, that Juror Piedimonte was disqualified from jury service on this case due to the trial court's conclusion that Juror Piedimonte possessed the possibility of bias towards one of the parties. Neither the trial court nor this court concludes that Juror Piedimonte engaged in misconduct. Jury service is not to be taken lightly and there is no indication that any member of the venire panel in this case failed to serve our system of justice in a serious manner.

twenty-seven quality assurance workers at four ConAgra microwave popcorn facilities. Dr. Lockey concluded that none of the quality assurance workers showed evidence of obstruction on the pulmonary function test. Dr. Egilman disagreed with Dr. Lockey's conclusion in the Lockey Study.

During the Khourys' case-in-chief, they presented evidence of the amount of popcorn they purchased and Mrs. Khoury's exposure. The Khourys' daughter testified that the family would buy cases of popcorn, and on family movie night, Mrs. Khoury would sometimes pop ten bags of popcorn. Mr. Khoury testified that he purchased a case of popcorn a week from either Sam's Club or Costco and sometimes from BJ's Club. Mrs. Khoury testified that she worked at the Blockbuster Video stores from 1996 to 2000. She stated that she popped between twenty and thirty bags of microwave popcorn on a weekend night or holiday for customer consumption at Blockbuster, two bags of popcorn a day for herself, and between six and ten bags of popcorn a night for her family.

In response to the Khourys' case-in-chief, ConAgra called their own expert witnesses to present evidence of causation and to respond to Dr. Egilman's Lockey Study testimony, and called fact witnesses to present evidence of the Khourys' popcorn purchases or lack thereof.

In its case-in-chief, ConAgra called Dr. Amy O'Brien–Ladner, a pulmonologist, to give her opinion as to what kind of lung disease Mrs. Khoury had and its cause. Dr. Ladner based her opinion on her examination of Mrs. Khoury, and her review of, among other things, Mrs. Khoury's medical records, including those of her treating physician, Dr. Remy. Dr. Ladner opined to a reasonable degree of medical certainty that Mrs. Khoury had a mild, steroid-responsive constrictive bronchiolitis. She testified that the cause was unknown—idiopathic.[3] Dr. Ladner differentiated "constrictive bronchiolitis" (inflammation around the bronchial that constricts the airway) from "bronchiolitis obliterans" (obstruction inside or obliteration of the airway). She testified that Mrs. Khoury's disease was not the same as the diseased workers at the popcorn plants.

ConAgra then called expert witness Dr. Kevin Latinis, an internist and rheumatologist, who had examined Mrs. Khoury and reviewed her medical records. Dr. Latinis testified to a reasonable degree of medical certainty that Mrs. Khoury had undiffer-

3. At oral argument, the Khourys suggested that, while Dr. Ladner physically examined Mrs. Khoury and reviewed all of her medical records (which included other records in addition to Dr. Remy's chart), the focus of her testimony was on Dr. Remy's medical chart and the focus of her causation opinion was that *all* pulmonologists—including Dr. Remy—would have to come to the same conclusion on causation that she came to. The Khourys argue that it is this "targeted" testimony by Dr. Ladner that justifies rebuttal causation opinion testimony by Dr. Remy that not all pulmonologists—including Remy—would come to the same conclusion on causation as that of Dr. Ladner. The Ladner testimony complained of was: "After reviewing the record, the best *I* can come up with is idiopathic ... *I* think we really have to go—as a pulmonologist—*I* need to go with an idiopathic process. *We* don't know how it started." (emphasis added). This testimony does not mention Dr. Remy's medical records in isolation, does not mention Dr. Remy by name, and does not categorically opine that *all* pulmonologists—including Remy—must interpret Mrs. Khoury's records the way she does. Though Dr. Ladner stated that "we" do not know how the disease started, she made clear that her opinions were her own and she was not speaking on behalf of Dr. Remy or suggesting that she knew what Dr. Remy's opinion would have been if he had testified in the Khourys' case-in-chief.

entiated connective tissue disease and that her lung disorder was related to her auto-immune disease.

ConAgra also called expert witness Dr. Patrick Hessel, a pulmonary epidemiologist who studies the relationship between exposures and diseases. He testified that he conducted a linear regression analysis by entering the Lockey Study data into a statistical computer program "to see if there is a linear relationship between exposure and lung function." He found no relationship between cumulative exposure and lung function.

Also in response to the Khourys' case-in-chief, ConAgra called fact witnesses to present evidence of the Khourys' wholesale club microwave popcorn purchases. ConAgra called representatives from the three wholesale clubs identified by Mr. Khoury. The representatives testified as to the following popcorn purchases by the Khourys: from Costco—472 bags of popcorn over ten years; from BJ's Wholesale Club—two purchases of thirty-six bags of popcorn over five years; from Sam's Club—from 1999 when the Khourys became members—out of 140 transactions—microwave popcorn was purchased on four occasions.

After ConAgra rested its case-in-chief, the Khourys began their rebuttal by calling Dr. Remy to offer his opinion as to causation to rebut Dr. Ladner's causation opinion. ConAgra objected, and the trial court limited Dr. Remy's testimony to a description of his medical chart and any opinions expressed in his medical chart relating to his care and treatment of Mrs. Khoury.

The Khourys then attempted to introduce copies of checks to show that they purchased microwave popcorn at stores other than the three wholesale clubs in evidence. ConAgra objected on the grounds that the evidence was not proper

rebuttal evidence and the trial court sustained ConAgra's objection.

The Khourys also recalled Dr. Egilman as a rebuttal witness to critique Dr. Hessel's regression analysis, but after objection, the trial court limited Dr. Egilman's rebuttal testimony and attempted use of charts as exhibits.

After an approximately three-week trial, the jury returned its verdict in favor of ConAgra on the Khourys' claims for product defect, failure to warn, and negligent manufacture. The Khourys moved the trial court to vacate and set aside the jury verdict and to grant a new trial. The trial court entered its final judgment on October 14, 2010, denying the motion and upholding the jury's verdict.

The Khourys appeal.

## Rebuttal Evidence

### Standard of Review

We review alleged errors in the trial court's exclusion of evidence under an abuse of discretion standard. *Aliff v. Cody*, 26 S.W.3d 309, 315 (Mo.App. W.D. 2000). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* A trial court has great discretion in determining whether evidence should be excluded, and its decision is given substantial deference on appeal. *Id.* at 314. The appellant has the burden of establishing abuse of discretion. *Id.* at 315. A reversal of the judgment for failure to admit evidence is not mandated unless the error materially affected the merits of the action and we find a substantial or glaring injustice. *Id.*

## Analysis

In the Khourys' first point on appeal, they assert that the trial court erred by restricting or refusing certain rebuttal evidence the Khourys were allowed to introduce at trial in three instances. We preliminarily note that:

> Admission of rebuttal evidence is a matter largely within the discretion of the trial court. A party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence and, while the court may in its discretion admit such evidence, it may and generally should decline to admit the evidence.

*Gassen v. Woy,* 785 S.W.2d 601, 604–05 (Mo.App. W.D.1990) (numerous internal citations omitted).

### Dr. Remy's Proffered Rebuttal Testimony

First, the Khourys claim that the trial court erred in restricting the rebuttal causation testimony[4] of Mrs. Khoury's treating pulmonologist—Dr. Remy—to the information and any opinions contained in Dr. Remy's medical records; the Khourys offered Dr. Remy's rebuttal testimony to refute ConAgra's expert—Dr. Ladner's—causation opinion that Mrs. Khoury's disease was idiopathic. ConAgra objected to Dr. Remy testifying as to causation because: (i) the Khourys had failed to name him as a causation expert witness, and he had never expressed an opinion on the cause of Mrs. Khoury's lung disease either in his written records or orally; (ii) any causation testimony by Dr. Remy should have been presented in the Khourys' case-in-chief; and (iii) his testimony would be cumulative to that of the other two experts that testified. After lengthy discussions of the issue between the parties and the trial court, the trial court limited Dr. Remy's testimony to the opinions actually expressed in his medical records, and prohibited testimony as to his conclusions regarding causation drawn from those records.

We find *Gassen* and *Edley v. O'Brien,* 918 S.W.2d 898 (Mo.App. S.D.1996), instructive. In *Gassen,* the central issue in the case was the correct interpretation of a radiological film. 785 S.W.2d at 605. In their respective cases-in-chief, the plaintiff and defendant each produced a medical expert to interpret the radiological film and, on rebuttal, the plaintiff attempted to present a third and different medical expert to corroborate the plaintiff's expert's testimony (from plaintiff's case-in-chief) and to contradict the defendant's medical expert. *Id.* The trial court refused to permit such attempted rebuttal evidence and, in affirming the trial court, this court stated:

> [The proposed rebuttal medical expert] was merely expressing another opinion corresponding to some extent with that of [plaintiff's case-in-chief medical expert]. It did not introduce any new fact into the case and it did not qualify as rebuttal merely because it tended to contradict the testimony of [defendant's

4. At oral argument, the Khourys suggested that this was not a case about trying to introduce causation expert opinion testimony by Dr. Remy as rebuttal evidence; yet, the Khourys' point relied on stated just the opposite—that the trial court erred in refusing to permit them to introduce evidence of Dr. Remy to "refute the [causation] opinion" of Dr. Ladner. And, in their appellate brief argument, the Khourys argued that their rebuttal evidence was designed to introduce Dr. Remy's "opinions on whether in fact he concluded that Mrs. Khoury's condition was idiopathic or, in fact, was caused by exposure to popping microwave popcorn." Our ruling today addresses the arguments propounded by the Khourys in their points relied on and arguments thereto in their appellate briefing.

medical expert]. [Plaintiff] was not entitled, as a matter of right, to admission of the evidence. It follows that there was no abuse of discretion in refusing to admit the testimony of [plaintiff's proposed rebuttal medical expert].

*Id.*

Similarly, in *Edley v. O'Brien*, the central medical issue at trial was the risk of stroke that the plaintiff faced as a result of proceeding with a surgery. 918 S.W.2d at 907. The plaintiff's case-in-chief presented evidence of unreasonable increased risks of stroke attendant with the subject surgery, and the defendant's case-in-chief presented evidence that there was no increased risk of stroke related to the surgery. *Id.* The plaintiff's proposed rebuttal medical testimony was that of a different medical expert on the subject of whether the surgery presented an unreasonable risk of stroke to the plaintiff. *Id.* For the same reasons outlined by *Gassen*, the court rejected the right to present this evidence as rebuttal evidence because it was not injecting a response to a new issue raised by the defendant's case-in-chief and it was cumulative evidence that was available to the plaintiff at the time of plaintiff's case-in-chief and could and should have been presented at that time—not during rebuttal. *Id.*

The same is true in this case. The central issue in this case was the *cause* of Mrs. Khoury's disease. The Khourys attempted to prove by the testimony of medical experts—Dr. Egilman and Dr. Parmet—that her condition was *caused* by exposure to vapors from microwave popcorn.[5] The opinions expressed by ConAgra's medical expert witnesses on *causation* were to the contrary. The Khourys made an offer of proof that Dr. Remy would have testified that to a reasonable degree of medical certainty Mrs. Khoury's disease was *caused* by popping microwave popcorn. This testimony would have simply expressed another opinion corresponding with that expressed by the Khourys' two medical expert witnesses during their case-in-chief. Dr. Remy's rebuttal testimony did not qualify as rebuttal merely because it would have contradicted Dr. Ladner's testimony. Thus, the trial court did not abuse its discretion in refusing to admit the cumulative causation testimony of Dr. Remy.[6]

### *Mrs. Khoury's Cancelled Checks*

Second, the Khourys charge that the trial court erred in refusing to allow Mrs. Khoury to testify in rebuttal regarding cancelled checks payable to various stores, as well as a calendar she kept, to demonstrate additional popcorn purchases,

---

5. Unlike *Marchosky v. St. Luke's Episcopal–Presbyterian Hospitals*, No. ED 95992, 2012 WL 121147 (Mo.App. E.D. Jan.17, 2012), the Khourys were not prevented from presenting *any* expert witness testimony on the issue of causation. Thus, the Khourys' reliance on *Marchosky* is misplaced.

6. Though not necessary to our ruling today, we also note that the Khourys' response to discovery seeking the identification of non-retained expert witnesses (Rule 56.01(b)(5)) was simply: "Plaintiff may call Elaine Khoury's treating physicians as non-retained experts. Plaintiff will supplement." Prior to trial, the Khourys did not supplement this response. In *Wilkerson v. Prelutsky*, our Supreme Court concluded that the following generic statement as to the identification of non-retained experts was not sufficient to require reversal of the exercise of the trial court's discretion in excluding the testimony of one of the plaintiff's treating physicians: "Plaintiff may also call as expert witnesses on damages any and all of Plaintiff's treating physicians. Said experts may testify to various aspects of the damage issues including fairness and reasonableness of the medical charges and causal relationship of the treatment provided to the carbon monoxide poisoning." 943 S.W.2d 643, 649–50 (Mo. banc 1997).

which was offered to refute ConAgra's evidence of the limited number of popcorn purchases from the three wholesale clubs that the Khourys had identified in their case-in-chief as the sources for their popcorn purchases. The trial court refused the proffered rebuttal evidence in part because "[i]f you had a stack of receipts or something, that might be different. But those checks don't prove anything," the "[c]hecks don't show popcorn purchases," and the checks "don't prove popcorn purchases, do they?" The Khourys made an offer of proof. The trial court rejected the offer, noting that "the way this whole case was structured from the very beginning proving that she bought popcorn somewhere and verified, therefore, that they ate these boat loads of popcorn would have been part of the case in chief and not proper rebuttal." The trial court, in fact, correctly noted that the Khourys presented evidence in their case-in-chief regarding popcorn purchases through the testimony of Mr. Khoury and the Khourys' daughter. Mrs. Khoury also testified during their case-in-chief, and any testimony by Mrs. Khoury regarding popcorn purchases was available and should have been offered then. *Aliff,* 26 S.W.3d at 317. The trial court did not abuse its discretion in refusing to allow Mrs. Khoury to testify in rebuttal as to cancelled checks allegedly representing evidence of other popcorn purchases.

### Dr. Egilman's Proffered Rebuttal Testimony and Evidence

Third, the Khourys assert that the trial court erred in restricting the rebuttal product defect and causation testimony and exhibits of Dr. Egilman, one of the Khourys' experts, which was offered to refute certain testimony and exhibits of Dr. Hessel (defendant's expert) on regression analysis. On rebuttal, the Khourys proffered Dr. Egilman's testimony to critique Dr. Hessel's regression analysis. In their offer of proof, the Khourys requested that the trial court admit certain rejected evidence: two charts prepared by Dr. Egilman reconfiguring Lockey Study records differently than they were reconfigured by Dr. Hessel, and a contract between the consortium that did the Lockey Study and the companies that funded it. The trial court admitted the documents for purposes of the record on appeal only. Given that Dr. Egilman testified as to the Lockey Study in his direct examination, any data on the same subject could have been introduced in the Khourys' case-in-chief. The trial court has discretion to refuse admission of rebuttal evidence that merely contradicts the adverse party's evidence. *Id.* at 317. Furthermore, the Lockey Study contract was ruled by the trial court to be irrelevant and inadmissible during Dr. Egilman's direct examination and the Khourys have not challenged that ruling by the trial court in this appeal. The trial court did not abuse its discretion in refusing the admission of the rebuttal testimony and corresponding exhibits of Dr. Egilman.

While it may not have been reversible error for the trial court to have *admitted* any or all of the rebuttal evidence complained of by the Khourys on appeal, we likewise find no substantial or glaring injustice in the trial court's *exclusion* of the rebuttal evidence at issue and no abuse of discretion by the trial court in refusing admission of the proffered rebuttal evidence by the Khourys.

Point I is denied.

### Removal of Juror

### Standard of Review

Substituting an alternate juror for a regular juror during trial is a matter entrusted to the discretion of the trial court. *Hudson v. Behring,* 261 S.W.3d

621, 624 (Mo.App. E.D.2008). "Replacement of a juror with an alternate is an appropriate remedy when there is a *possibility* of bias." *Id.* We will not reverse a trial court's ruling on a motion for new trial based upon juror nondisclosure absent an abuse of discretion, which our courts have defined as a ruling that is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Johnson v. McCullough,* 306 S.W.3d 551, 555 (Mo. banc 2010).

## Analysis

In the Khourys' second point on appeal, they assert that the trial court erred in removing Juror Piedimonte. They contend that: (i) there was no proof that Juror Piedimonte intentionally failed to disclose material information requested during voir dire; (ii) ConAgra's request for relief was untimely; and (iii) they were prejudiced by the juror's removal after the jury was empanelled. The Khourys rely on *Johnson v. McCullough* in framing their issue on appeal. We find that *Johnson* is distinguishable on its facts and does not control our analysis.[7] On the facts before us, the ultimate issue is whether the trial court abused its discretion in replacing Juror Piedimonte with an alternate juror upon concluding that Juror Piedimonte may have held a *possible* bias

against ConAgra that was not previously disclosed by Juror Piedimonte during voir dire.

■■■■ The Missouri Constitution guarantees civil litigants the right to a fair and impartial jury of twelve qualified jurors. Mo. Const. art. I, § 22(a); *Williams ex rel. Wilford v. Barnes Hosp.,* 736 S.W.2d 33, 36 (Mo. banc 1987). "Even though three-fourths of the jury can decide a civil case, parties are entitled to have that decision, whether for them or against them, based on the honest deliberations of twelve qualified jurors." *Hudson,* 261 S.W.3d at 624. "Litigants 'are entitled to unbiased jurors whose experiences . . . will not prejudice the resolution of the case.'" *Id.* (quoting *Williams,* 736 S.W.2d at 36). "[A] competent juror must be in a position to enter the jury box disinterested and with an open mind, free from bias or prejudice." *Id.*

■■■■ The trial court has the discretion to substitute an alternate juror for a regular juror during trial. *Id.* Alternate jurors are selected in the same manner, have the same qualifications, are subject to the same examination and challenges, take the same oath, and have the same functions as principal jurors. § 494.485, RSMo 2000. "Alternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury retires to

---

7. *Johnson v. McCullough,* 306 S.W.3d 551, 555 (Mo. banc 2010), relates to juror nondisclosure relating to the litigation history of potential jurors—which can fairly routinely be ascertained via a Case.net search on Missouri's automated case record service website—and the circumstances of *Johnson* were such that the challenge to the alleged juror's bias due to nondisclosure was not made until *after* the complained-of juror had participated in the jury's verdict (and the alternate jurors had been excused). And, the focus of the Supreme Court's cautionary dictum near the end of its opinion was to promote "reasonable

efforts" to bring "litigation history" web search "hits" to the attention of the trial court "prior to trial." *Id.* at 559. In this case, while Internet technology was required to obtain the pertinent juror information, it was not litigation history information—for which we now have a specific Supreme Court Rule—Rule 69.025 (which was not in effect at the time of this trial); instead, the Internet information regarding possible undisclosed bias of Juror Piedimonte was collected after voir dire but *before* a single piece of evidence—or even opening statements—had been presented in the trial.

consider its verdict, become or are found to be unable or disqualified to perform their duties." *Id.* "Determining whether a juror is 'unable or disqualified' is within the trial court's discretion." *State v. Robinson*, 26 S.W.3d 414, 418 (Mo.App. E.D. 2000).

### Juror Nondisclosure and Possibility of Bias

ConAgra asserted that by not answering affirmatively to two of the questions its trial counsel posed during voir dire, Juror Piedimonte intentionally failed to disclose that he was biased against corporations. One of the voir dire questions referenced by ConAgra was:

> I need you to search in your heart of hearts and ask yourselves, are you sure in this case that you would be able to treat ConAgra Corporation the same as a flesh-and-blood individual, Ms. Khoury over here? If you can't do that, again, there isn't any shame in it or harm in it; it may not be the right case for you to serve on. There may be ways for you to serve at other times. If you don't feel in your heart of hearts you'll be able to treat us the same as Ms. Khoury, could you hold up your card and just be honest about it? [8]

Three members of the venire interpreted the question to inquire about corporate bias and disclosed that they could not be fair to ConAgra or would be more likely to side with the Khourys. Juror Piedimonte remained silent.

The Khourys contend that this question did not call for disclosure of corporate bias. While one reasonable interpretation of the voir dire question may be as the Khourys suggest, it is clear that another reasonable interpretation is that the question did, in fact, solicit disclosure of a possible bias towards corporate entities—as that is how three members of the venire interpreted it and openly responded as such.

Subsequent to the jury being empanelled, but prior to opening statements, ConAgra presented the trial court with copies of material from Juror Piedimonte's *Facebook*[9] page and personal blog allegedly relating to "corporate criminals, credit rating agencies, economic warfare, socialism," and moved for a mistrial or, in the alternative, to strike Juror Piedimonte.[10] The trial court conducted an examination of Juror Piedimonte to determine the existence of his alleged bias toward corporations.

In many respects, the testimony of Juror Piedimonte reflects Piedimonte's reaffirmed belief in his ability to be impartial upon questioning by the trial court and counsel for the parties. However, in response to a question about whether he

---

**8.** ConAgra's counsel did not follow up with any questions to "narrow the focus of the [voir dire] questions," which courts have recognized can cause confusion among venire persons. *Banks v. Vill. Enters., Inc.*, 32 S.W.3d 780, 786–87 (Mo.App. W.D.2000) (internal quotation omitted); *Aliff v. Cody*, 987 S.W.2d 439, 443–44 (Mo.App. W.D.1999) (recognizing that counsel's questions may reasonably narrow the scope of information sought, resulting in unintentional failure to disclose relevant information).

**9.** *Facebook* is a popular Internet social networking website operated by Facebook, Inc.

**10.** Clearly, the voir dire question itemized previously herein did not solicit Piedimonte's *Facebook* page blogging information and nobody has accused Juror Piedimonte of failing to disclose this information in response to the voir dire question seeking the disclosure of corporate bias. Instead, ConAgra's counsel fairly argued that Juror Piedimonte's *Facebook* page calls into question the veracity of his response to the "corporate bias" question posed during voir dire.

would have answered the original voir dire question by ConAgra's counsel differently if he had understood it to be inquiring as to any interests relevant to corporations and the attachment of those interests to the possibility of corporate bias, Juror Piedimonte responded: "It's hard to say, to go back, but possibly. It just wasn't really on my mind necessarily. But, yes, it's possible."

 Upon the conclusion of the examination of Juror Piedimonte, the trial court denied ConAgra's motion for mistrial and sustained the motion to strike. Subsequently, the trial court stated:

> *What I'm shooting for here is a fair and impartial jury.* And what we've got now is 15 people who have passed the muster by any way that you want to measure it. And nobody has lodged additional objections against those 15 people.... *I think it's a very close call whether Mr. Piedimonte should have been removed at all.* I'm actually following through on what is my heartfelt conviction that my primary duty in voir dire is to *make sure that any opportunity for bias or prejudice to filter into the jury deliberations is extinguished ....* And I am satisfied now that has been achieved and the renewed motion for mistrial is denied.

(Emphasis added.) Considering that the trial court characterized its decision to remove Juror Piedimonte as "a very close call," it is clear that the trial court decided out "of an abundance of caution, . . . to remove the juror and replace him with an alternate." *Robinson,* 26 S.W.3d at 418. "Replacement of a juror with an alternate is an appropriate remedy when there is a *possibility* of bias." *Hudson,* 261 S.W.3d at 624. Even if a juror reaffirms his ability to be impartial upon questioning by the trial court, "[a] venireperson should not be allowed to judge his own qualification to serve as a juror." *Id.* at 625 (internal quotation omitted). "The trial court is in the best position to determine whether a juror will be able to effectively discharge his duties." *Yaeger v. Olympic Marine Co.,* 983 S.W.2d 173, 187 (Mo.App. E.D. 1998) (quoting *Lester v. Sayles,* 850 S.W.2d 858, 870 (Mo. banc 1993)).

 In short, while an appellate court has the benefit of a "cold" transcript, we do not have the benefit of "eyeballing" the witness—or in this case the juror—answering questions relating to his possible bias, and we do not have the ability to judge the credibility of the answers given by the juror at the time they are given. The trial court is, however, placed in that position, and it is precisely the reason we accord so much discretion to our colleagues on the trial bench in "close calls" relating to the "possibility" of juror bias or other issues relating to the ability of a juror to effectively discharge his duties. It is also the reason that we cannot conclude that the trial court abused its discretion in concluding, out of an abundance of caution, that Juror Piedimonte was not qualified to serve on the jury in this case because of the *possibility* of Juror Piedimonte's corporate bias.[11] Under these cir-

11. It is important to note that our ruling today is not a suggestion that jurors are "fair game" for continuous Internet "screening" during the course of a trial. Instead, when as here, there is evidence fairly suggesting intentional nondisclosure to a voir dire question, litigants have a right to bring such alleged nondisclosure to the trial court's attention by way of motions similar to those filed by ConA-

gra in this case. But, as our ruling today indicates, it is also not a requirement for the trial court to conclude that a juror has, in fact, engaged in intentional nondisclosure during voir dire for the trial court to exercise its discretion to grant relief to strike a juror from the jury when the trial court has not abused its discretion in concluding that a

cumstances, the trial court was within the bounds of its discretion to leave Juror Piedimonte on the jury or, as was done, to remove Juror Piedimonte. We will not disturb the discretion exercised by the trial court where we cannot conclude that doing so was an abuse of the trial court's discretion.

### Timeliness of Objection to Juror Piedimonte and the Issue of Prejudice

The Khourys, relying on *Johnson v. McCullough,* next contend that the trial court erred in failing to grant them a new trial because ConAgra's motion to strike Juror Piedimonte was untimely filed after the jury was empanelled, thereby causing them to suffer prejudice warranting a new trial.

Despite the Khourys' suggestion that *Johnson* applies "equally to researching jurors for any alleged material nondisclosure," that issue was not before the *Johnson* court. In *Johnson,* the Missouri Supreme Court considered whether a juror nondisclosure argument based on *litigation history* was untimely when it was brought after the complaining party received an adverse verdict following a six-day jury trial. 306 S.W.3d at 558. Following the law in existence at the time of trial, the court found that there was no evidence that it was practicable for counsel

to have investigated the litigation history of all the selected jurors prior to the jury being empanelled. *Id.* The *Johnson* court, however, admonished future parties to jury-tried cases—in dictum—not "to wait until a verdict has been rendered to perform a Case.net search for jurors' prior litigation history when, in many instances, the search also could have been done in the final stages of jury selection or after the jury was selected but prior to the jury being empanelled." *Id.* at 559. Noting the advances in technology, the court stated that "[u]ntil a Supreme Court rule can be promulgated to provide specific direction, to preserve the issue of a juror's nondisclosure,[12] a party must use *reasonable efforts* to examine the *litigation history* on Case.net of those jurors selected but not empanelled and present to the trial court any relevant information prior to trial." *Id.* at 559 (emphasis added).

In short, *Johnson* reflects a concerted effort by the Missouri Supreme Court to address timely and reasonable investigation of the *litigation history* of potential jurors. It is no coincidence that when the Supreme Court later promulgated a rule—Rule 69.025—the rule was expressly related to juror nondisclosure on the topic of *litigation history* only. Neither *Johnson* nor any subsequently promulgated Supreme Court rules on the topic of juror nondisclosure require that *any and all* research—Internet based or otherwise—

---

juror possesses the possibility of bias towards one of the parties in the jury proceeding.

**12.** Supreme Court Rule 69.025 became effective January 1, 2011, after the trial in this case. Notably, though, Rule 69.025 expressly limits the dictates of required background Internet searches on potential jurors to Case.net searches of a potential juror's litigation history. The rule could have similarly required "reasonable investigation" into other areas of "possible bias" and could have required such "reasonable investigation" to include a search of Internet social and business networking

sites such as *Facebook, MySpace,* or *LinkedIn,* to name a few. And, the rule could have similarly required "reasonable investigation" of potential jurors via Internet search engines such as *Google* or *Yahoo!,* to name a few. Or, the rule could have simply required a blanket "Internet search" on "any and all issues of prospective juror bias." But, clearly, it does not. As such, neither can we impose such requirements in reviewing the trial court's analysis of the parties' "reasonable" efforts to timely search for evidence of juror bias.

into a juror's alleged material nondisclosure must be performed and brought to the attention of the trial court *before* the jury is empanelled or the complaining party waives the right to seek relief from the trial court. While the day may come that technological advances may compel our Supreme Court to re-think the scope of required "reasonable investigation" into the background of jurors that may impact challenges to the veracity of responses given in voir dire *before* the jury is empanelled—that day has not arrived as of yet.

That said, we note that when this court most recently addressed the topic of the timeliness of an objection to a juror's alleged intentional nondisclosure of material information in voir dire, we stated: "We encourage counsel to make such challenges *before submission of the case* whenever practicable." *McBurney v. Cameron*, 248 S.W.3d 36, 41 (Mo.App. W.D.2008) (emphasis added). It is, of course, no coincidence that section 494.485 mandates that alternate jurors shall replace jurors who, *prior to the time the jury retires to consider its verdict*, are determined by the trial court to be unable or *disqualified* to perform their duties. Here, ConAgra lodged its objection to Juror Piedimonte not just *before* the case was *submitted*, but actually *before any evidence whatsoever had been introduced at trial*. ConAgra's motion to strike Juror Piedimonte was neither untimely nor prejudicial to the Khourys.

 In further illustration, we note that the facts of *Johnson* are distinguishable from this case in yet another important fashion. In *Johnson*, the juror who allegedly failed to disclose her litigation history in response to a question on that topic during voir dire, *actually served on the jury and participated in the jury's verdict*. 306 S.W.3d at 554–55. Here, the allegedly unqualified juror *did not sit on the jury or otherwise participate in the jury's verdict*. Rather, upon ConAgra's motion, the trial court struck Mr. Piedimonte from the jury. The undisputed fact is that the twelve jurors who did sit on the jury were all, indisputably, qualified.[13] A party "do[es] not have a right to a specific juror or to representation on the jury of a particular point of view." *Robinson*, 26 S.W.3d at 418. Prejudice is not shown where there is no claim or suggestion from the record that any of the jurors selected to deliberate on the case was biased and should have been removed. *See Rodgers v. Jackson Cnty. Orthopedics, Inc.*, 904 S.W.2d 385, 388 (Mo.App. W.D.1995).

Point II is denied.

## Conclusion

The judgment of the trial court is affirmed.

GARY D. WITT, Presiding Judge, and JOSEPH M. ELLIS, Judge, concur.

---

**13.** To the extent that the Khourys contend that they were prejudiced because the jury panel was not qualified, we find the argument unavailing. "[T]he right to exercise peremptory challenges from a full panel of qualified jurors is not a constitutional or a common law right; it is solely statutory in origin, and the Missouri statutes historically have limited that right to criminal cases only." *Rodgers v. Jackson Cnty. Orthopedics, Inc.*, 904 S.W.2d 385, 389 (Mo.App.W.D.1995) (citing *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)). Under section 494.480, RSMo Cum.Supp.2010, the right to a qualified panel is accorded only to parties in criminal actions, and even then only in limited circumstances.